UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

VERIZON NEW YORK INC. and LONG ISLAND
LIGHTING COMPANY d/b/a LIPA,

                              Plaintiffs,

          -against-

  THE VILLAGE OF WESTHAMPTON BEACH,
THE VILLAGE OF QUOGUE and THE TOWN
OF SOUTHAMPTON,

                              Defendants.

11-CV-252 (LDW)

LIPA'S PROPOSED CONCLUSIONS OF LAW REGARDING LIPA's AUTHORITY TO
LICENSE ATTACHMENTS TO ITS UTILITY POLES

          Pursuant to this Court's February 4, 2013 Order, Plaintiff Long Island Lighting Company

d/b/a LIPA ("LIPA") hereby submits its Proposed Conclusions of Law Regarding LIPA's

Authority to License Attachments to its Utility Poles.

## PROPOSED CONCLUSIONS OF LAW

**A.     LIPA's Broad Statutory Powers Encompass Granting Pole Attachment Rights.**

          1.     LIPA was formed as "a corporate municipal instrumentality of the state [] which

shall be a body corporate and politic and a political subdivision of the state, exercising essential

governmental and public powers."  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. §

1020-c(1).

          2.     LIPA was established pursuant to the New York State legislature's adoption of

the LIPA Act.  Section 1020-ii of that Act expressly requires that the Act's provisions be

"liberally construed" because the Act is "necessary for the prosperity of the state and its

inhabitants," and Section 1020-jj further provides that "insofar as the provisions of this title are

inconsistent with the provisions of any other law or part thereof, the provisions of this title shall be controlling." *Id.*

3.     The New York State legislature has granted LIPA broad powers generally and broad powers specifically as to transmission facilities or related equipment, such as utility poles. First, as a general matter, LIPA's enabling act provides that LIPA "shall have all of the powers necessary or convenient to carry out the purposes and provisions of this title." *See id.* at § 1020-f.[1]  The legislature then further clarified that, without "limiting the generality of the foregoing" grant of necessary and convenient powers, LIPA's necessary and convenient powers include:

> (d) To  .  .  .  own, hold, improve, employ, use and otherwise deal in and with, real or personal property whether tangible or intangible, or any interest therein, within the state;
> .                          .                          .
>
> (f) To sell, convey, lease, exchange, transfer, abandon or otherwise dispose of, or mortgage, pledge or create a security interest in, all or any of its assets, properties or any interest therein, wherever situated;
> .                   .                   .                   .
>
> (h) To make and execute agreements, contracts and other instruments necessary or convenient in the exercise of the powers and functions of the authority under this title, including contracts with any person, firm, corporation, municipality, state agency or other entity in accordance with the provisions of section one hundred three of the general municipal law .  .  .

*Id.*

4.     A pole is "property" and the license agreements at issue here "deal in" such poles. *See id.* at § 1020-f(d).

---

[1]   These provisions are consistent with the Transportation Corporations Law pursuant to which LILCO is organized and are consistent with the Business Corporations Law made applicable to LILCO by Transportation Corporations Law § 4 ("Applicability of business corporations law to transportation corporations").

5.      The license agreements "convey" and "dispose of" an interest in LIPA's assets and properties.  *See id*. at § 1020-f(f).

6.      The license agreements are "contracts [or] other instruments necessary or convenient in the exercise of [LIPA's] powers and functions [under the LIPA Act]."  *See id*. at § 1020-f(h).

7.      Moreover, in a separate section of the LIPA Act containing no reference or limitation to the LIPA Act's "purposes and provisions," the State Legislature provided that LIPA "shall have the specific power" to "determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility."  *See id*. at § 1020-g(c).

8.      A pole is a "transmission or other related facility" as it contributes to supporting wires that transmit electricity to LIPA customers.

9.      Several reasons support the conclusion that these provisions grant to LIPA the power to allow attachments, such as the lechis, to be made to its poles.  First, the statute's plain terms state, without limitation, that LIPA has the power to "determine the . . . use . . . of any . . . transmission or other related facility."  *Id*. at § 1020-g(c).  LIPA's decision to permit the EEEA to attach lechis (as well as LIPA's decision to allow other entities to hang signs and banners) falls squarely within the legislature's unqualified grant of power to LIPA.  In this respect, it is especially notable that Section 1020-g(c) contains no "lead-in" language referencing these powers being granted in connection with, or limited by, the LIPA Act's "purposes or provisions."  *See id*.  Rather, the plain language indicates that these are powers that the legislature granted to LIPA to exercise in its discretion.

10.    Second, even as to the powers granted in Section 1020-f, the New York State legislature has made explicit that LIPA's necessary and convenient powers include: (a) the power to "own . . . use *and otherwise deal in* and with, real or personal property whether tangible or intangible, or *any interest therein*, within the state"; (b) the power to "dispose of" and "convey" interests in property and assets; and (c) the power to "make and execute agreements, contracts and other instruments." These various general powers, in plain terms, provide LIPA the authority to allow lechis to be attached and to allow LIPA to enter into the license agreement that establishes the terms related to the lechis' attachment.

11.    Finally, even if some affirmative connection were required to be demonstrated between the installation of the lechis and the state legislature's purposes in establishing LIPA, at least two such purposes exist, especially when it is recalled that the LIPA Act is to be "liberally construed." *Id.* at § 1020-ii. First, the LIPA Act indicates that LIPA was established to address the desire to make Long Island a more attractive location for commerce and to improve its inhabitants' "health, welfare and prosperity." *Id.* at §§ 1020-a, 1020-p(1). Thus, the lechis which play a role in the eruv's creation, and the eruv, in turn – by making certain areas more attractive as a place for various EEEA members to live and in allowing them to engage in various activities on the Sabbath that would otherwise be limited (whether those activities are religious, commercial, or simply social) – contributes to this purpose. *ACLU v. City of Long Branch*, 670 F. Supp. 1293, 1296 (D.N.J. 1987) (holding that an eruv served the secular purpose of permitting "a large group of citizens to access public properties"). Second, the lechis are subject to a per pole license fee, albeit a small one of five dollars per attachment per pole per year, plus the applicable amounts for payments in lieu of revenue taxes. Stip. of Undisputed Facts Ex. D, License Agreement at 23. But small or not, given that the statute is to be liberally

4

read, such an effect of collecting revenue, in connection with allowing the lechis, contributes to the cost-effective use of LIPA resources, another statutory purpose.  The preamble to the LIPA Act specifically identifies "realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area" as goals that the State of New York has identified for LIPA to achieve.  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-a.

12.     Conversely, LIPA's granted powers cannot reasonably be read to be limited to allowing only attachments that play a direct role in facilitating electricity delivery or similar services (such as cable or telephone wire attachments).  Such a "strict construction" of LIPA's powers would be at odds with Section 1020-ii, which expressly requires that the Act's provisions be "liberally construed" because the LIPA Act is "necessary for the prosperity of the state and its inhabitants" and the Act's purpose is to improve their "health, welfare and prosperity," *id*. at § 1020-p(1).

13.      Moreover, pursuant to Section 1020-i of the LIPA Act, LIPA has the right to exercise and perform all or part of its powers and functions through a wholly-owned subsidiary (such as LILCO), and "such subsidiary corporation shall have all the privileges, immunities, tax exemptions and other exemptions of the authority to the extent the same are not inconsistent with the statute or statutes pursuant to which such subsidiary was incorporated . . . ."  *Id*. at subd. (2).

14.     In sum, LIPA enjoys broad grants of statutory authority as a state instrumentality and these statutory authorities, in turn, also accrue to LILCO as LIPA's subsidiary, including LILCO's continuing authority as an electric corporation pursuant to the Transportation Corporations Law and the Business Corporations Law.

15.     These broad powers granted to LIPA are further recognized in the Public

Authorities Accountability Act of 2005 and the Public Authorities Reform Act of 2009 – both

passed after the LIPA Act – which specifically acknowledge LIPA's (and other state authorities')

power to dispose of property and contain no restrictions on that power.  *See* Public Authorities

Accountability Act of 2005, ch. 766, sec. 15, Pub. Auth. Law § 2800(1); Public Authorities

Reform Act of 2009, ch. 505, sec. 6, Pub. Auth. Law § 2800(1).

16.      These authorities fully authorize the making of the Iechi license agreement with

the EEEA.

**B.     Neither the Scope of Powers Granted in the Transportation Corporations Law, Nor the Specific Franchises to Which Westhampton Beach and Quogue Point, Serve as Limits on LIPA's Power To Grant Pole Attachment Licenses.**

17.     As to other bases on which the municipalities rely in seeking to limit LIPA's

powers, contrary to the municipalities' contentions, LIPA – an instrumentality of New York

State exercising governmental and public powers – is not a "corporation" to which the

Transportation Corporations Law applies or, *a fortiori*, to which the Business Corporations Law

applies.  *Cf. Buell v. Herkimer*, 244 A.D. 599 (N.Y. App. Div. 1935) (a municipal commission

authorized to supply power to a village is not a "corporation" subject to the Transportation

Corporations Law).  *See also* N.Y. Transportation Corporations Law § 2 (a "transportation

corporation" for purposes of the Transportation Corporations Law "shall be either . . . [a] gas

corporation, an electric corporation or a gas and electric corporation").

18.     Transportation Corporations Law Section 10 defines "electric corporation" as "a

corporation organized to manufacture, to produce or otherwise acquire, and to supply for public

use electricity for light, heat or power, and for lighting streets, avenues, public parks and places

and public and private buildings of cities, villages and towns within this state."

6

19.     In contrast, LIPA is a "body corporate and political and a political subdivision of the state, exercising essential governmental and public powers."  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-c(1).

20.     Thus, Transportation Corporations Law Section 11(3) has no application to LIPA.

21.     Nor does New York case law establish that a municipality that has granted a franchise for the maintenance of utility poles retains the right to dictate to the franchisee what it may or may not do with its own property, *i.e.*, the poles.[2]

22.     *New York Telephone Co. v. Town of North Hempstead*, 86 Misc.2d 487 (N.Y. Sup. Ct. 1975), *aff'd on memo below*, 385 N.Y.S.2d 505 (N.Y. App. Div. 1976), *aff'd as modified*, 41 N.Y.2d 691 (1977) is directly on point both as to the laws cited and as to a municipality's lack of authority to dictate to a franchisee.  In *New York Telephone Co.*, a public utility's authority to share its pole space was unsuccessfully challenged.  The telephone company, a "telephone corporation" organized pursuant to the Transportation Corporations Law, sued the town in which its poles were located for rent and injunctive relief when the town attached its own street lighting fixtures to the company's poles.  86 Misc.2d at 491.  The company possessed a franchise to erect and maintain poles for its lines on the public streets and highways.  *Id*. at 493.  Ultimately, the Court of Appeals held that the telephone company was

---

[2] To the degree that Westhampton Beach and Quogue argue that they may oppose the lechis because LIPA's organic statutes do not give LIPA power to license attachments, without Westhampton Beach and Quogue relying further on restrictions imposed through the franchises, Westhampton Beach and Quogue lack standing to make the argument.  Westhampton Beach and Quogue provide no authority to support the proposition that it has standing, and a free-standing right, to challenge LIPA actions by asserting that such actions are *ultra vires* LIPA's organic statute.  *Dairylea Coop., Inc. v. Walkley*, 38 N.Y.2d 6, 9 (N.Y. 1975)  (holding that to have standing to rely on a statute, a party must affirmatively demonstrate their standing by showing they are within the zone of interest that the statute is meant to protect).

entitled to a mandatory injunction directing removal of the Town's fixtures and compensation for damages.  41 N.Y.2d at 700.

23.     Of special significance here, the town in *New York Telephone Co.* had argued two points:  first, that "the plaintiff may only use its poles for telephone purposes" and, second,  that "the use of the poles for purposes other than that for which the plaintiff was granted a special franchise under section 27 of the Transportation Corporations Law is beyond its powers."  86 Misc.2d at 493.

24.     The court rejected both arguments.  First, it rejected the town's narrow construction of the franchise and observed that "there is no express prohibition against the use of the 'necessary fixtures' such as poles for purposes other than telephonic communication."  *Id.*

25.     Second, the *New York Telephone* court also held that, because Transportation Corporations Law Section 4 "mak[es] the plaintiff subject to the provisions of the Business Corporations Law, the plaintiff possesses the right to enter into contractual arrangements with others for the use of space on its poles pursuant to the powers granted in subdivision (a) of section 202 of the Business Corporation Law."  *Id.*

26.     Indeed, the Transportation Corporations Law's incorporation of the Business Corporations Law applies to all "transportation corporations," including "electric corporations" such as LILCO.  Transportation Corporations Law §§ 2(a), 4.

27.     The *New York Telephone Co.* court thus struck the town's affirmative defense that the telephone company lacked authority to use its poles for anything other than telephone purposes.  *Id.*  The Appellate Division affirmed on the Supreme Court's opinion, 385 N.Y.S.2d 505, and the Court of Appeals left that ruling undisturbed, 41 N.Y.2d 691.

28.     Thus, the court in *New York Telephone Co.* refused to impose limitations on utilities' rights to use or allow others to use utility poles, even if that additional use was for purposes other than to provide telephone services (if a "telephone corporation") or electricity (if an "electric corporation").

29.     LILCO, an entity that LIPA controls and the assignee of the franchises at issue here and as a statutory "transportation corporation," stands in the same shoes as the telephone company in *New York Telephone Co.*  In addition, the legislature gave to LIPA the power to acquire LILCO with all of LILCO's attendant powers.  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-h.  That alone would be enough to dispose of the claim that LIPA's powers are limited in the manner the municipalities argue.  That conclusion is then further supplemented when one takes account of the further broad grant of statutory authority given to LIPA as a state instrumentality acting in the public's benefit and doing business through LILCO. In sum, New York statutory provisions such as the Transportation Corporations Law provide no bar to the lechi license agreement here.  LIPA's authority pursuant to the franchises includes making pole attachment agreements and is not circumscribed by any statutory provisions

30.     Indeed, if Westhampton Beach's and Quogue's argument were to prevail in place of the rule established in *New York Telephone Co.*, far more than the attachments of lechis to poles in Westhampton Beach and Quogue could be affected.  The Court takes judicial notice of the fact that a single pole typically supports wires of different types – electrical, telephone, and cable to name several – and this case demonstrates that various poles are owned by different entities – sometimes a telephone company, sometimes an electricity-related public authority. Thus, it is reasonable to conclude that the provision of electrical, lighting, and telephone services

depends on pole sharing arrangements between separately franchised electric and telephone companies or with public authorities like LIPA.

31.    Thus, reaching a conclusion here that an entity is limited to using its poles for solely its own basic service (*e.g.*, Verizon-owned poles only for telephone service and LIPA-owned poles only for electricity) would create uncertainty as to whether, for example, local municipalities could declare that lighting fixtures on telephone poles or telephone wires on electric utility poles violate narrowly construed franchise rights.

32.    Additionally, it would call into question the validity of other pole attachments throughout LIPA's service area, including the banner and holiday lighting attachments that LIPA permits on its poles.  *See* Stip. of Undisputed Facts Exs. E to I, examples of other attachment agreements.

33.    The *New York Telephone Co.* case equally disposes of the WHB franchise-based argument as applied to LIPA.

34.    Assuming that a municipal franchisor may restrict a franchisee's right to license a pole attachment, *New York Telephone Co.* demonstrates that a public franchise permitting the franchisee to erect and maintain utility poles for an identified purpose, but *lacking an express prohibition against other uses of those poles*, does not reserve to the franchisor an implied right to prohibit other pole uses.  *See* 41 N.Y.2d at 693.

35.    It is only the presence of relevant, specific, and detailed prohibitory language – not the absence of express authorizing language – that could bar LIPA from sharing its pole space.  *See* 86 Misc. 2d at 493.

36.     If the original franchisor, Southampton, desired to prohibit the franchisee from licensing pole attachment rights, it needed to do so expressly.  It did not, and, therefore, *New York Telephone Co.* demonstrates that this argument is unavailing.  86 Misc.2d at 493.

37.     The franchises relied on here, Stip. of Undisputed Facts Exs. R and S, the historic Riverhead and Patchogue franchises, have no express prohibition on the franchisee's ability to make pole space available to others and, thus, no such reserved right exists here.

38.     The Riverhead and Patchogue franchises are insufficient to establish such an express limitation on LIPA's (or its predecessors Riverhead Electric and Patchogue Electric) authority.

39.     The Riverhead Franchise states that:

> The Town Board of the Town of Southampton hereby grants to the Riverhead Electric Light Company the privilege and right to erect and maintain poles for the support of cross-arms, fixtures and wires and construct and maintain necessary pole lines for supplying electricity for heat, light and power to the inhabitants of said Town, in, under and over the highways of the Town of Southampton, west of the Quantuck Creek . . .

Stip. of Undisputed Facts Ex. R, Riverhead Franchise.

40.     The Patchogue Franchise states that:

> The Town Board of the Town of Southampton hereby grants to the Patchogue Electric Light Company the privilege and right to erect and maintain poles for the support of cross-arms, fixtures and wires and construct and maintain necessary pole lines for supplying electricity for heat, light and power to the inhabitants of said town in, under and over the highways of the Town of Southampton west of Speonk River and south of a line one thousand feet north of and parallel with the Old Country Road . . .

Stip. of Undisputed Facts Ex. S, Patchogue Franchise.

41.     These franchises provide that the franchisee has the authority to "construct and maintain necessary poles lines for supplying electricity for heat, light and power."  Stip. of

11

Undisputed Facts Ex. R, Riverhead Franchise; Stip. of Undisputed Facts Ex. S, Patchogue

Franchise.  These franchises provide no limits to the authority to maintain poles so long as they

are being used for supplying electricity.  *Id*.  If the original Southampton Town Board had

intended to define the franchisees' authority to maintain their poles to exclude the franchisees

permitting non-electricity attachments, that limiting intent needed to be expressly incorporated

into the franchises.  Additionally, if the franchises are read to exclude attachments that are

unnecessary for the supply of electricity, then the franchisees may not even permit attachments

for the delivery of telephone and cable to residents within the franchise boundaries.  Such a

result is untenable and inconsistent with the language of the franchises.  *See id*.

      42.     In this connection, limitations on transferring the franchises are irrelevant.

LIPA's agreement with the EEEA does not transfer the franchises.  Stip. of Undisputed Facts Ex.

D.  Instead, by its plain terms, the eruv attachment agreement would merely grant the EEEA a

revocable license "to place and maintain attachments as specified in Exhibit A to be located in

the non-communication space of the LICENSOR's pole."  *Id*. at Art. II, § 1.  It is ancient law that

a license is simply a privilege to do certain acts on, but without possessing any interest in, the

property.  *See, e.g.*, *Greenwood L. & P. J. R. Co. v. New York & G. L. R. Co.*, 134 N.Y. 435, 440

(1892).

      43.     Finally, the Court notes that the LIPA Act references franchises, stating that

"[a]fter the establishment of Long Island Power Authority (LIPA) and the commencement of its

function as a utility, LIPA shall acquire from LILCO all franchise and utility service

responsibilities. . . ."  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-g(n).

This language, however, does not suggest that the New York State legislature intended LIPA's

authority to be limited by the franchises.  Rather, this language was designed to ensure that LIPA

would undertake the "responsibilities" of providing electricity within the franchise areas in which LILCO was then operating.  *See id*.

**C.**     **The LIPA Act Is Not Subject to Franchise Limits or Local Ordinances**

44.     Even if the franchises' original terms limited LILCO's authority to maintain its poles, or even if a local ordinance might restrict a private entity, the LIPA Act has provided LIPA with new authority that is not subject to the franchise limits or to local ordinances.

45.     The LIPA Act provides that LIPA has the authority to "acquire, construct, improve, rehabilitate, maintain and operate such generating, transmission and related facilities as the authority deems necessary or desirable to maintain an adequate and dependable supply of gas and electric power within the service area" and "to determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility."  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-g.

46.     In adopting the LIPA Act, the State legislature was also clear that the LIPA Act trumps any competing state law (as for example, any state law enumerating a municipality's powers and authorities) because the LIPA Act further provides that "[i]nsofar as the provisions of this title are inconsistent with the provisions of any other law or any part thereof, the provisions of this title shall be controlling."  *Id*. at § 1020-jj.

47.     The New York State legislature has the power to adjust the relative authorities of its sub-entities such as municipalities and LIPA.  *Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. 394, 397 (1919) (holding that a State may withdraw legislative grant to a city of the power to regulate rates a gas company could charge and, instead, confer those regulatory powers upon a commission).

48.    The Westhampton Beach Board of Trustees 1949 resolution urging the Coast Guard to grant a permit to LILCO for the installation of an aerial power crossing over the Quogue Canal has no bearing on LIPA's authority here.  That resolution concerns a permit for which LILCO applied to the *United States Coast Guard*, not Westhampton Beach, and – as such – evidences no check on LIPA's authority by Westhampton Beach.  *See* Stip. of Undisputed Facts Ex. K, 1949 Board of Trustees of the Village of Westhampton Meeting Minutes.

49.    Therefore, even if LILCO was once limited in its authority because of the franchises, LIPA is not so restricted because the LIPA Act neither imposes nor recognizes such franchise-based limits on LIPA's authority.

50.    Similarly, even assuming that the state had once given to the municipality the authority to enforce those franchise limitations or municipal ordinances, the state legislature has now adjusted the relative powers and authorities of LIPA, a state entity, as compared to Westhampton Beach and Quogue, two other state entities.  In providing the broad grant of powers, it has empowered LIPA to act as it has done here.  At most, such a state legislative action simply amounts to the reordering of powers among various state entities and it is clearly the legislature's right to make such a reordering.  *See Pawhuska*, 250 U.S. at 397.

51.    Therefore, even if municipal ordinances might apply to private entities and serve to limit their authority relating to their utility poles, LIPA enjoys absolute authority to locate and use its poles as it sees fit and, therefore, any franchise limits are inapplicable to LIPA.

52.    Similarly, LIPA's broad authority relieves it of being subject to any sign ordinance.[3]  *See infra* Section F.

---

[3] This is not to say that any sign ordinance therefore becomes irrelevant to whether lechis may be installed.  Other private parties that attach items to LIPA poles do not enjoy the authority that LIPA has been given.  It is thus possible that the sign ordinances may remain effective against

14

**D.      The United States Constitution's Contract Clause Has No Relevance**

53.      The Court also rejects the argument that finding that the LIPA Act supersedes the franchises would create an unconstitutional impairment of a municipality's contract rights, i.e., that LIPA's position, if adopted, would unconstitutionally impair a municipality's asserted rights to limit LIPA's pole activities under the franchises.

54.      Even if a franchise is a "contract" for constitutional purposes, municipalities, like LIPA, are creatures of the State of New York.  In turn, it remains open to the New York legislature to make adjustments in the respective powers of each entity at any time, without any implications as to the Contract Clause.

55.      The Contract Clause is, instead, meant to protect *private parties* from overreaching state action that bears on a contract, not state action directed at one of the state's own subsidiary entities.  *Trenton v. New Jersey*, 262 U.S. 182, 185-86 (1923).  None of the cases presented to this Court are cases in which a municipal entity was the party claiming to have had its contract rights impaired by the State– rather in each case it was a private party whose contract rights were affected.  ECF No. 75, Westhampton Beach Reply in Supp. of Mot. Summ. J. at 6.

56.      By comparison, and directly on point, is the Supreme Court's conclusion that "[t]he power of the State, *unrestrained by the contract clause* . . . over the rights and property of cities held and used for 'governmental purposes' cannot be questioned."  *Trenton v. New Jersey*, 262 U.S. 182, 188 (1923) (emphasis added).  In *Trenton*, the City of Trenton sued the state, arguing that a state statute imposing fees on municipalities for withdrawing water from public streams impaired "contract rights" that the City held that allowed it to make withdrawals without a fee.  *Id*. at 184.  The City maintained it had acquired those contract rights through its

---

such private parties to prohibit them from making pole attachments, if such attachments are "signs" or "encroachments" and the ordinances are otherwise constitutionally permissible.

acquisition of a private water company that held a contract with the state, in turn generating for

the municipality contract water rights that did not involve the fee.  *Id*. at 185.

        57.     In a rationale directly on point here, the Supreme Court rejected the claim.  In

doing so, the Court noted that:

> municipalities have no inherent right of self-government which is
> beyond the legislative control of the state.  A municipality is
> merely a department of the state, and the state may withhold, grant,
> *or withdraw* powers and privileges as it sees fit.  However great or
> small its sphere of action, it remains the creature of the state,
> exercising and holding powers and privileges subject to the
> sovereign will.

262 U.S. at 187 (emphasis added).[4]  In turn, it necessarily followed that:

> [t]he *relations existing between the state and the water company
> were not the same as those between the state and the city.* The
> company was organized and carried on its business for pecuniary
> profit. *Its rights and property were privately owned, and therefore
> safeguarded by the constitutional provisions here sought to be
> invoked by the city against the legislation of the state.* The city is a
> political subdivision of the state, created as a convenient agency
> for the exercise of such of the governmental powers of the state as
> may be intrusted to it.

262 U.S. at 185-86 (emphasis added).

        58.     Given this, the legislature's action in *Trenton* simply did not present a federal

question under the Contract Clause, because the state's broad power over its own entity was not

something the Contract Clause limited or constrained and the state remained free to limit the

municipality's water rights in ways it might not have with respect to the original private

company.  *Id*.

---

[4] Indeed, Westhampton Beach has acknowledged this in its own papers. When seeking to
establish the source of its own power over roads within the Village and in seeking to establish its
successor status to the original franchises (as to which Westhampton Beach was not the original
grantor), Westhampton Beach itself cites state statutes as the source of its powers.  *See*
Westhampton Beach Reply Mem., at p. 8, citing New York Village Law, Sections 1-102 and 6-
602.  *See also* Stip. of Undisputed Facts ¶ 7.

59.    Similarly, in *Pawhuska v. Pawhuska Oil & Gas Co.,* 250 U.S. at 397, the

Supreme Court held that no Contract Clause question was raised when a state withdrew from a

city a legislative grant of the power to regulate rates that a gas company could charge and,

instead, conferred those regulatory powers upon a commission.  In language also directly on

point here, the Court observed:

> Thus, the whole controversy is as to which of two existing
> agencies or arms of the state government is authorized for the time
> being to exercise in the public interest a particular power,
> obviously governmental, subject to which the franchise
> confessedly was granted. In this no question under the contract
> clause of the Constitution of the United States is involved, but only
> a question of local law . . .

*Id*. at 397-398.  *See also New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973) ("[P]olitical

subdivisions of a state may not challenge the validity of a state statute under the Fourteenth

Amendment."); *Williams v. Mayor and City Council of Baltimore*, 289 U.S. 36, 40 (1933) ("[a]

municipal corporation, created by a state for the better ordering of government, has no privileges

or immunities under the Federal Constitution which it may invoke in opposition to the will of its

creator.").  In short, it is clear that as a matter of legal authority, the New York legislature has

broad discretion to determine which public entity – a municipality or LIPA itself – should

control the use of LIPA's poles and in exercising such authority, no Contract Clause issue is

created.

60.    Thus, the Contract Clause has no relevance here.

**E.    The LIPA Franchise Is Apportionable**

61.    As an alternative basis for sustaining the License Agreement, this Court can

properly apply the doctrine of "apportionability," traditionally applied in easement law.  *Hoffman*

*v. Capitol Cablevision Systems, Inc.*, 52 A.D.2d 313 (N.Y. App. Div. 1976), presented an issue

strikingly similar to the one presented here.  Private landowners sued Capitol Cablevision over the company's placement of equipment on utility poles maintained on an existing easement given to the electric and telephone companies.  *Id*. at 314-15.  In affirming a dismissal order, the court held that the electric and telephone companies had "exclusive easements in gross which were properly apportioned to defendant without compensation to [the servient property owners]" and without requiring the owners' consent.  *Id*. at 318.

62.     As in *Hoffman*, the attachments at issue here would not impose any burdens on Westhampton Beach's or Quogue's rights-of-way beyond those already imposed attendant to the original franchise grants.  And like the easements at issue in *Hoffman*, a franchise that permits pole installations does not depend on the franchisee (here the EEEA) being extended an ownership of specific real property.

63.     Finally, as with the exclusive easement found apportionable in *Hoffman*, LILCO and LIPA exclusively own their poles.  Stip. of Undisputed Facts ¶ 15.  Given the close similarities between "exclusive easements in gross" over private property and the functionally equivalent situation that applies to the poles at issue here,  the common law doctrine of apportionment also applies here, thus permitting the lechi attachments.

**F.     Westhampton Beach and Quogue Have Identified No Municipal Regulations Prohibiting Lechis.[5]**

64.     Westhampton Beach has enacted no regulation prohibiting the attachment of lechis to utility poles, and it has affirmatively conceded that it has no such regulation.  *See*

---

[5] While LIPA believes that the following argument goes beyond the issue of whether LIPA has the authority to license attachments to its poles, we briefly address the issue here because of our uncertainty regarding the Court's intended scope for this submission and in the event that the municipalities address this issue in their submissions.

Preliminary Injunction Hearing, *East End Eruv Assoc. v. Village of Westhampton Beach*, 11-cv-213 (E.D.N.Y.), Tr. 279:17-23 (Teller).

65.     Westhampton Beach neither exercised whatever police powers, if any, it may have to regulate pole attachments, nor has it articulated a basis for concluding that the health, safety, morals or general welfare of its residents warrants prohibiting the attachment of lechis to utility poles. *See e.g.*, *Trs. of Union Coll. v. Members of the Schenectady City Council*, 91 N.Y.2d 161, 165 (1997) ("[w]ith the police power as the predicate for the State's delegation of municipal zoning authority, a zoning ordinance will be struck down if it bears no substantial relation to the police power objective of promoting the public health, safety, morals or general welfare [citations omitted])."

66.     Section 158-1 of the Quogue Village Code provides that "No encroachment or projection upon, into, or over any public road or street in the Village of Quogue shall be made or maintained." *See* Quogue Village Code § 158-3.

67.     The Quogue Village Code defines an "Encroachment" as:

> Any private use of any portion of a public right-of-way through any structure or device, whether upon, above or under said right-of-way; but nothing herein contained shall be construed to apply to any vehicle or any easement now legally owned by any public service corporation. The term 'encroachment' also includes any private use of any portion of a public right-of-way for the display and sale of any products, goods, wares or merchandise.

*Id*. §158-2.

68.     The Quogue Village Code defines a "Projection" as:

> any part of any building, structure or device erected upon private property or attached to any structure or device erected upon private property.

*Id*. § 158-3.

19

69.     The Quogue Village Code defines a "Public Road or Street" as "[t]he area between the extreme lines of any public right-of-way in this Village, including any state or country road or highways as well as a Village road or street."  *Id.*

70.     Quogue argues that the foregoing provisions of the Village Code act as an absolute bar to the attachment of lechis to utility poles.  As described above, however, LIPA's rights and powers with respect to its utility poles derive from state law, not local law, and that state law expressly trumps any competing law.  *See supra* ¶ 45.

71.     Thus, whether some of LIPA's poles stand within the bounds of the public streets within the villages has no effect on LIPA's authority to place and control its poles.  The LIPA Act provides that LIPA "shall have the specific power" to "determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility."  Stip. of Undisputed Facts Ex. A, LIPA Act, Pub. Auth. Law § 1020-g(c).  The LIPA Act further provides that "[i]nsofar as the provisions of this title are inconsistent with the provisions of any other law or any part thereof, the provisions of this title shall be controlling."  *Id.* at § 1020-jj.  Therefore, LIPA's authority to place and control its poles within the villages is superior to any authority the villages have to control the public streets or the area within the bounds of the public streets.

72.     In addition, the contract between LIPA and the EEEA does not relate to use of the street right-of-way, nor does the contract divert the highways from public use to private use.  Instead, it contemplates the issuance of licenses to attach lechis to LIPA's own utility poles, *i.e.*, it relates to the use of LIPA's personal property.  *See N.Y. Tel. Co.*, 41 N.Y.2d at 699 ("The town concedes, as it must, that the utility poles themselves are personal property."); *see also* Stip. of Undisputed Facts ¶ 15.

20

73.     The lechis to be attached to LIPA's utility poles under its contract with the EEEA

are not "encroachments" or "projections."  The lechis are 5/8" inch half round strips of PVC that

would run vertically along the poles and could be painted to blend in with the poles.  Stip. of

Undisputed Facts ¶¶ 13, 14; Stip. of Undisputed Facts Ex. J, Board of Trustees of Quogue

Decision Denying EEEA Application, at 1.

74.     Quogue has previously taken the position that the lechis constitute a "device"

under the Village Code, citing the definition of "device" from free online dictionaries:  (1) "a

thing made for a particular purpose[; an invention or contrivance, especially a mechanical or

electrical one]" (from Dictionary.com); and (2) "a contrivance or invention serving a particular

purpose[, especially a machine used to perform one or more relatively simple tasks]" (from

thefreedictionary.com).  Quogue's Opp'n to EEEA's Renewed Motion for Preliminary

Injunction, at 13 n.3.  The bracketed portions of these definitions, which Quogue omitted,

confirm that a lechi does not fall within the "normal construction" of the term "device," as it is

neither a "contrivance" nor a "device" that performs a "mechanical" or "electrical" function.

75.     Nor can Quogue rely on purported "policy" justifications (i.e., "safety of our

residents," "beauty and quality of life in the Village," and "to avoid constitutional violations and

liability").  Quogue has established no facts relating the lechis to a safety risk.  *See generally*

Stip. of Undisputed Facts.  As Quogue's Board admitted in its decision denying the EEEA's

application, the lechis "can be painted any color to blend with the surroundings."  Stip. of

Undisputed Facts Ex. J, Board of Trustees of Quogue Decision Denying EEEA Application, at 1.

Quogue admits that the lechis' visibility would vary based on an observer's attentiveness and

proximity to the poles.  Stip. of Undisputed Facts ¶ 14.  Therefore, the lechis will not affect the

beauty of the Village or the quality of life of its residents.  Quogue has also failed to establish

that the attachment of lechis to LIPA's poles will involve Quogue in a constitutional violation.


Respectfully submitted,

Dated:  March 20, 2013
        Washington, D.C.

_____/s/_____
Ronald J. Tenpas
Jessica M. Zetwick
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave., N.W.
Washington, D.C. 20004
rtenpas@morganlewis.com
Telephone:  (202) 739-5435
Facsimile:  (202) 739-3001

LONG ISLAND POWER AUTHORITY
Michele A. Pincus
Associate General Counsel
333 Earle Ovington Blvd.
Uniondale, NY 11553
Telephone: (516) 719-9884
Facsimile: (516) 222-9137

*Counsel for Long Island Lighting Company d/b/a
LIPA*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 20, 2013, I have caused a copy of the foregoing Proposed

Conclusions of Law to be served via ECF on all counsel of record.


_____/s/_____

Jessica M. Zetwick