Robert G. Sugarman
Yehudah L. Buchweitz
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8184

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

VERIZON NEW YORK INC. and LONG ISLAND
LIGHTING COMPANY d/b/a LIPA,

                     Plaintiffs,

    -against-

THE VILLAGE OF WESTHAMPTON BEACH,
THE VILLAGE OF QUOGUE and THE TOWN
OF SOUTHAMPTON,

                     Defendants.

**Index No. 11-CV-252 (LDW)**

**STATEMENT IN SUPPORT OF THE PROPOSED CONCLUSIONS OF LAW
SUBMITTED BY VERIZON NEW YORK, INC. AND LONG ISLAND LIGHTING CO.,
D/B/A LIPA REGARDING THEIR AUTHORITY TO LICENSE ATTACHMENTS TO
<u>THEIR UTILITY POLES</u>**

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES ..................................................................................................... ii
PRELIMINARY STATEMENT ................................................................................................ 1
ARGUMENT .............................................................................................................................. 2
A DETERMINATION BY THE COURT THAT THE UTILITIES LACK AUTHORITY
TO LICENSE THE ATTACHMENT OF LECHIS TO THEIR POLES THREATENS
THE LEGAL STATUS OF ALL ERUVIN IN NEW YORK STATE THAT WERE
CREATED THROUGH LICENSING AGREEMENTS WITH THE UTILITIES ................... 2

    A.    Eruvin Have Existed in Scores of Communities Throughout the United
            States for More than a Century Without Controversy or Rancor ........................... 2

    B.    If the Utilities Are Found to Lack Authority to License Third-Party
            Attachments to their Poles, the Dozens of Eruvin that Exist in New York
            State Could Be Invalidated ...................................................................................... 7

    C.    An Adverse Determination by the Court on the Question of the Utilities'
            Authority Would Result in a Continuation of the Burden on Plaintiffs'
            Sincerely-held Religious Beliefs and Practices ...................................................... 8

THE APPLICABILITY OF CHAPTER 158 OF QUOGUE'S VILLAGE CODE IS NOT
AN ISSUE BEFORE THIS COURT IN THIS PROCEEDING, BUT EVEN IF IT
WERE, THE ORDINANCE DOES NOT APPLY IN THIS CASE ........................................... 10

    A.    The Applicability of Chapter 158 of Quogue's Village Code is Not an
            Issue Before the Court in This Proceeding .......................................................... 10

    B.    Chapter 158 Does Not Apply to the Lechis ......................................................... 11

CONCLUSION .......................................................................................................................... 14

## **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Adrian v. Town of Yorktown*,
   341 Fed. Appx. 699 (2d Cir. 2009) ................................................................................. 11

*East End Eruv Ass'n, Inc., et al. v. Village of Westhampton Beach, et al.*,
   828 F. Supp. 2d 526 (E.D.N.Y. 2011) ............................................................................ 12

*East End Eruv Ass'n, et al. v. Village of Westhampton Beach, et al.*,
   Case No. CV 11-0213 (E.D.N.Y.) ................................................................................ 1-2

*Green v. Miller*,
   249 N.Y. 88 (1928) ......................................................................................................... 13

*Verizon New York, Inc., et al. v. The Village of Westhampton Beach, et al.*,
   Case No. 11 Civ. 0252 (E.D.N.Y.) (LDW) ....................................................................... 1

*Wolff v. Dist. of Columbia*,
   196 U.S. 152 (1905) ....................................................................................................... 13

*Wong v. Yoo*,
   649 F. Supp. 2d 34 (E.D.N.Y. 2009) ............................................................................. 11

**STATUTES**

Quogue, N.Y., Village Code § 158-1 ..................................................................................... 11

Quogue, N.Y., Village Code § 158-2 ............................................................................... 11, 12

**OTHER AUTHORITIES**

*Device Definition*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000) ........... 12

*Public Right-of-Way Definition*, BLACK'S LAW DICTIONARY (9th ed. 2009) ......................... 13

East End Eruv Association, Inc. ("EEEA"), Marvin Tenzer, Morris Tuchman, Clinton Greenbaum, Alan Schechter, Carol Schechter, Jeffrey Lean, Alexa Lean, Deborah Pollack, and Simcha Pollack (collectively, "Plaintiffs") respectfully submit this memorandum in support of the conclusions of law submitted by Verizon New York, Inc. ("Verizon") and Long Island Lighting Co., d/b/a LIPA ("LIPA") (the "Verizon/LIPA Conclusions of Law") in the case *Verizon New York, Inc., et al. v. The Village of Westhampton Beach, et al.*, Case No. 11 Civ. 0252 (E.D.N.Y.) (LDW) (the "Verizon/LIPA Action") regarding their authority to license third-party attachments to their utility poles under New York State law (the "Memorandum").

## **PRELIMINARY STATEMENT**

Before the Court is the question of whether Verizon and LIPA (collectively, the "Utilities") have the authority under New York State law to license third-party attachments, such as lechis, to their respective utility poles without obtaining prior municipal approval. Plaintiffs support the position taken in the Verizon/LIPA Conclusions of Law that Verizon and LIPA do possess such authority under New York State law, and will not restate the legal arguments in the Verizon/LIPA Conclusions of Law. Instead, Plaintiffs submit this Memorandum for the purpose of apprising the Court of the wide-ranging and negative impact that an adverse determination on the issue of the Utilities' authority would have on scores of Jewish communities not only on Long Island, but also throughout New York State.

Plaintiffs further submit this Memorandum to address the Village of Quogue's putative attempt to use Chapter 158 of its Village Code to argue that Verizon and LIPA do not have the authority to authorize EEEA to attach the lechis to their poles. The applicability of Chapter 158 of Quogue's Village Code should not be decided now but, instead, at the later trial in the companion case of *East End Eruv Ass'n, Inc., et al. v. Village of Westhampton Beach, et al.*,

Case No. CV 11-0213 (E.D.N.Y.) (the "companion case"). If the Court decides to consider that issue, Plaintiffs submit that Chapter 158 does not apply to the lechis in this case.

## ARGUMENT

**A DETERMINATION BY THE COURT THAT THE UTILITIES LACK AUTHORITY TO LICENSE THE ATTACHMENT OF LECHIS TO THEIR POLES THREATENS THE LEGAL STATUS OF ALL ERUVIN IN NEW YORK STATE THAT WERE CREATED THROUGH LICENSING AGREEMENTS WITH THE UTILITIES**

The effects of an adverse determination by this Court on the issue of the Utilities' authority to enter into eruv pole attachment licensing agreements under New York law would not be limited to this case. While the consequences of such an adverse determination would be grievous for Plaintiffs, as they would continue to be deprived of the eruv that they have been struggling to establish for years over the defendant municipalities' opposition, the consequences would extend far beyond the Village of Westhampton Beach, the Village of Quogue, and the Town of Southampton (the "Municipalities"). Indeed, dozens of communities throughout New York State have created eruvin by entering into the very same kinds of licensing agreements with the Utilities which defendants are attacking here. A ruling by the Court against the Utilities on the question of their authority to enter into such eruv licensing agreements could invalidate these dozens of community eruvin throughout New York State.

**A.** **Eruvin Have Existed in Scores of Communities Throughout the United States for More than a Century Without Controversy or Rancor**

As noted in Plaintiffs' amended complaint ("Am. Compl.") in the companion case, the first eruv in the United States was established in 1894 in St. Louis, Missouri, and since then, eruvin have multiplied throughout the United States. *See* Am. Compl. ¶ 34.[1] Today, at least

---

[1] All citations to docketed items, unless otherwise indicated, refer to documents filed in the companion case.

2

twenty-eight of the fifty states contain one or more municipalities with an eruv. *See* Am. Compl. ¶ 34. Indeed, so ubiquitous are eruvin in the United States that even the White House is located within an eruv. President George H.W. Bush lauded and supported the creation of the Washington, D.C. eruv in a 1990 letter to the local Jewish community:

> Now, you have built this *eruv* in Washington, and the territory it covers includes the Capitol, the White House, the Supreme Court, and many other Federal buildings. By permitting Jewish families to spend more time together on the Sabbath, it will enable them to enjoy the Sabbath more and promote traditional family values, and it will lead to a fuller and better life for the entire Jewish community in Washington. I look upon this work as a favorable endeavor. God bless you.

*Id.* ¶ 35 & Ex. C (1990 Letter from George Bush to Congregation Kesher Israel).

New York State alone has approximately seventy communities with eruvin, many of which exist as the direct result of licensing agreements with utility companies such as Verizon or LIPA. On Long Island, in particular, LIPA has entered into licensing agreements with twenty-two organizations for the purpose of permitting the attachment of lechis on LIPA poles.[2] *See* Declaration of Robert G. Sugarman ("Sugarman Decl."), Ex. A. The Long Island organizations with which LIPA has eruv pole attachment agreements include:

- Eruv Committee of Atlantic Beach (Atlantic Beach)
- Congregation Ohab Zedek, Inc. (Belle Harbor)
- Elmont Jewish Center (Elmont)
- Eruv Association of Great Neck, Inc. (Great Neck)

---

[2] This list excludes EEEA and the Hampton Synagogue, which have likewise entered into eruv pole attachment licensing agreements with LIPA, but whose proposed eruvin have not materialized because of the defendant municipalities' unflinching opposition and interference, as noted in Plaintiffs' and the Utilities' prior papers.

- Huntington Eruv Inc./Young Israel of Huntington (Huntington)
- South Shore Eruv Corp. (Hewlett)
- Lawrence/Far Rockaway Eruv Committee of Congregation Kneseth Israel (Lawrence)
- Lido Beach Synagogue (Lido Beach)
- Young Israel of New Hyde Park (New Hyde Park)
- Roslyn Synagogue (Roslyn Heights)
- Stony Brook Hebrew Congregation (Stony Brook)
- Temple Hillel – Eruv (Valley Stream)
- 5-Towns Eruv (Town of Hempstead)
- Congregation Beth Sholom Chabad (Mineola)
- Young Israel of Long Beach (Long Beach)
- Eruv – Merrick (Merrick)
- Young Israel of North Woodmere (North Woodmere)
- Young Israel of North Bellmore (North Bellmore)
- Young Israel of Plainview (Plainview)
- Young Israel of East Northport (East Northport)
- Bayswater Community Eruv Association (Far Rockaway)
- Young Israel of Oceanside (Oceanside)

*See* Sugarman Decl., Ex. A. Verizon has similarly entered into pole attachment licensing agreements in New York State, including several on Long Island. The Long Island organizations with which Verizon has eruv pole attachment agreements include:

- B'nai Brith Hillel Foundation (Stony Brook)

- Huntington Eruv, Inc. (Huntington)

- Lawrence/Far-Rockaway Eruv Committee of Congregation Kneseth Israel (Far Rockaway)

- Young Israel of East Northport (East Northport)

- Young Israel of North Bellmore (North Bellmore)

In virtually all of the New York communities with eruvin created through licensing agreements with the Utilities, the respective eruv organizations obtained the cooperation of the Utilities and municipal authorities in the construction of the eruv apparently without complaint, controversy, or legal objection as to the Utilities' authority to license space on their poles to the eruv association or synagogue for the attachment of lechis. Indeed, in several of these communities, the municipal authorities did not merely tolerate the eruv, but encouraged it. At a ceremony in December 2010 to celebrate the expansion of the eruv in central Queens, New York, to six new neighborhoods, Queens Borough President Helen Marshall stated: "It speaks to the great multi-ethnic community we have here in Queens. We have the most multi-ethnic community in the United States." *See* Am. Compl. ¶ 39 & Ex. G. Similarly, on February 15, 2008, Town of Oyster Bay, Long Island, Supervisor John Venditto presented a citation, signed by all members of the town board, to Rabbi Ellie Weissman of the Young Israel of Plainview, on the occasion of the expansion of the Plainview eruv to additional parts of Plainview, Old Bethpage, and Hicksville. *See id.* ¶ 36. The citation recognized "the important role that The Young Israel of Plainview contributes to the community" and wished "all the members of The Young Israel of Plainview good health and blessings in the future on the expanded ERUV." *See id.* & Ex. D; *cf.* Sugarman Decl., Ex. B (Times Series Article, March 13, 2013 (quoting

5

committee member Maureen Braun with regard to an eruv in London explaining that "This will make a huge difference to the people that follow these aspects of the religion and will cause no problem for anyone who doesn't. [ ] It's a lovely sign of tolerance and understanding and gives so much to the people that want it")).

Nor was the eruv greeted in these New York municipalities with opposition by elements within the Jewish community itself, as has been the case with Plaintiffs' proposed eruv. Quite the contrary: as an open letter by the Suffolk County Board of Rabbis (the "SBR")—"the recognized umbrella rabbinic organization in [Suffolk C]ounty by the New York Board of Rabbis bringing together Reconstructionist, Reform, Conservative, and Orthodox rabbis"— notes, opposition to an eruv has no basis in the tradition, philosophy, or outlook of any of the major Jewish denominations:

> The members of the SBR, whose signatures appear below, are in favor of the construction of an Eruv in the towns of Westhampton Beach, Southampton and Quo[g]ue. As the Eruv is an unobtrusive construction that allows those members of the Jewish community to more easily observe Shabbat, Yom Kippur, holy days, and holidays, we see no reason that it should not be allowed. We are also very concerned by the at times uncivil tenor of the discussion regarding the Eruv and have concerns as to the motives of those fighting the building of an Eruv. We also express strong concern for the misrepresentation of the Reform Jewish position on the matter of an Eruv.
>
> An Eruv can be found in many communities in our Metropolitan area as well as throughout the world and has not affected the quality of life of the communities-at-large. We, therefore, hope that this issue can be reconciled and concluded as quickly as possible. We, also, offer our assistance in any way necessary to help achieve this end.

*See* Sugarman Decl., Ex. C (Open Letter from SBR (Apr. 20, 2012)), at 1. Therefore, an eruv is an integral, well-established, and uncontroversial feature of dozens of communities throughout

Long Island and New York State. These eruvin, however, would not be in existence but for the execution of appropriate licensing agreements between local eruv associations and synagogues, on the one hand, and utility companies such as Verizon, and LIPA, on the other hand.

> **B. If the Utilities Are Found to Lack Authority to License Third-Party Attachments to their Poles, the Dozens of Eruvin that Exist in New York State Could Be Invalidated**

If this Court determines that utility companies such as Verizon and LIPA do not have the authority under New York State law to enter into pole attachment agreements to license the use of space on their poles for lechis, then the legal validity of almost every single eruv in New York State could be called into question. As noted, most of these eruvin exist only by dint of an express licensing agreement between a utility company and local organization representing the rights of those in need of an eruv. Other than in this case, Plaintiffs are not aware of any circumstance where a utility's authority to attach objects to its poles was challenged. If the Utilities do not have the authority to enter into these agreements under New York State law, however, then all lechis and other necessary eruv attachments currently affixed to utility poles in New York State likely would have to be dismantled, thereby depriving the observant Jewish residents of these communities of the eruvin that they have used and relied on for decades. Sabbath observance in these communities would radically change: observant Jews who for years carried prayers shawls, prayer books, and other objects to synagogue on the Sabbath and Yom Kippur, and pushed strollers and wheelchairs on these holy days, all in reliance on an eruv, would suddenly be forbidden to do so pursuant to their sincerely-held religious beliefs. This would create an extraordinary burden and alter the dynamics of religious life in these communities.

Accordingly, a ruling against the Utilities on the issue of their authority to enter into eruv licensing agreements would not only harm Plaintiffs by depriving them of the specific eruv that they have been struggling to establish for years over defendants' opposition; it would threaten to upset the existence of eruvin for tens of thousands of people, as well as the normal way of life for observant Jews in dozens of Jewish communities throughout the state. Plaintiffs submit that, apart from the cogent legal reasons proffered by the Verizon/LIPA Conclusions of Law, such an outcome would be manifestly unjust and contrary to the public policy of New York State and the United States, and should be rejected by this Court.

    **C.**    **An Adverse Determination by the Court on the Question of the Utilities' Authority Would Result in a Continuation of the Burden on Plaintiffs' Sincerely-held Religious Beliefs and Practices**

Plaintiffs further submit that the burden on their religious practices that they have been experiencing for years because of the absence of an eruv in the Municipalities provides sufficient policy grounds for this Court to find that the Utilities possess the authority under New York State law to enter into eruv pole attachment licensing agreements. As noted in Plaintiffs' multiple prior submissions, the individual Plaintiffs have a sincerely-held religious belief that they are not permitted to carry or push objects in the public thoroughfare on the Sabbath and Yom Kippur without an eruv. *See*, *e.g.*, Am. Compl. ¶¶ 27-33; Pls.' Mem. of Law in Supp. of their Mot. for Prelim. Inj. (ECF. No. 42-1) ("Original PI Mem."), at 3; Mem. of Law in Supp. of Pls.' Renewed Mot. for a Prelim. Inj. Against Quogue (ECF. No. 172-1) ("Quogue Mem."), at 8-9; Mem. of Law in Supp. of Pls.' Mot. for Partial Summ. J. or, in the Alternative, for a Prelim. Inj. Against Westhampton Beach (ECF No. 177-40) ("WHB Mem."), at 19. As a result of the Municipalities' opposition to and interference with EEEA's valid contracts with the Utilities permitting the attachment of lechis to certain of the Utilities' poles in the Municipalities,

however, Plaintiffs still do not have the eruv that they seek. *See, e.g.*, Am. Compl. ¶¶ 42-118; Quogue Mem., at 2-7; WHB Mem. at 3-9. This has perpetuated burdens on Plaintiffs' religious practice and lifestyle that are directly attributable to the absence of an eruv. Without an eruv, Plaintiffs Alan Schechter, Carol Schecter, Tenzer, and Tuchman, or another adult member of their respective families, must sometimes stay home from synagogue on the Sabbath or Yom Kippur to watch those of their grandchildren who cannot walk to synagogue without strollers. *See, e.g.*, WHB Mem., at 16; Quogue Mem., at 9. Plaintiff Tenzer's daughter-in-law's father, with whom his family is close, will not stay at Tenzer's home in Westhampton Beach on the Sabbath or Yom Kippur because he is dependent on a wheelchair and would be confined to Tenzer's home for the duration of the Sabbath or Yom Kippur without an eruv. *See* WHB Mem., at 16. Without an eruv, Plaintiff Alan Schechter's father—who is over eighty-years old and has trouble walking to the synagogue—must choose between struggling to walk to the synagogue on the Sabbath and Yom Kippur, on the one hand, and not attending services, on the other. *See id*. And, without an eruv, Plaintiffs may not carry basic travel necessities (such as personal identification, bottles of water, house keys, and reading glasses), as well as religious articles necessary for Sabbath services (such as prayer shawls and prayer books). *See, e.g.*, Am. Compl. ¶¶ 27-29, 32-33; Original PI Mem., at 3-4; Quogue Mem., at 9; WHB Mem., at 17. Nor can they take their children to the park or visit with friends.

These burdens, however (which are reflective of the burdens being experienced by observant Jews throughout the Municipalities because of the lack of an eruv), can only be alleviated by the attachment of lechis to certain of the Utilities' poles in the Municipalities—something that Plaintiffs and the Utilities have already agreed upon in their respective eruv pole attachment licensing agreements. *See, e.g.,* Am. Compl. ¶¶ 52-55 & Exs. P-R. The issue of the

Utilities' authority to enter into such agreements is not a mere technical question of New York State utility law: a favorable determination by the Court would bring Plaintiffs one step closer to their First Amendment right to an eruv, while an adverse determination would perpetuate the burdens Plaintiffs have been experiencing in their religious practice for the last several years.

### THE APPLICABILITY OF CHAPTER 158 OF QUOGUE'S VILLAGE CODE IS NOT AN ISSUE BEFORE THIS COURT IN THIS PROCEEDING, BUT EVEN IF IT WERE, THE ORDINANCE DOES NOT APPLY IN THIS CASE

Quogue's apparent attempt to argue that its police power allows it to use its local encroachments ordinance to limit Verizon's and LIPA's authority to attach lechis to their poles inappropriately places before this Court an issue that—aside from its irrelevance—goes beyond this Court's request for a trial on the issue of whether Verizon and LIPA possess the initial authority to attach objects to their poles. Even if this Court were to determine Chapter 158's applicability, this Court still should find that Chapter 158 does not apply to the lechis at issue in this case.

### A. The Applicability of Chapter 158 of Quogue's Village Code is Not an Issue Before the Court in This Proceeding

Quogue's attempt to place the question of the applicability of Chapter 158 of its Village Code before this Court at this time is particularly inappropriate given this Court's specific directive requesting a trial on the singular issue of Verizon's and LIPA's authority to attach objects to its poles. *See, e.g.*, Feb. 4, 2013 Order ("As stated at oral argument today, plaintiffs and defendants Quogue and WHB are given until 2/25/13 to submit stipulated facts and proposed conclusions of law on the issue of Verizon's and LIPA's *authority to attach the lechis*.") (emphasis added). Chapter 158 does not relate to nor does it have any impact on the determination of this specific question. Indeed, any attempt to have that issue resolved in this

10

proceeding flies in the face of the prior proceedings in the companion action. In that action at a court conference held on December 9, 2011, the Court directed the Plaintiffs to make an application to the Village of Quogue to permit the placing of the lechis on the poles in the Village and stated:

> THE COURT: The one [Westhampton Beach] has nothing. There you can go head immediately. They [Quogue] have something. Will you please apply there first. Do it in Westhampton Beach. If they [Quogue] delay it, let me know, and we will then change our position. You understand that?
>
> MR. SUGARMAN: Put it up in Westhampton Beach, make an application to Quogue.
>
> THE COURT: Yes.

Sugarman Decl. Ex. D (Hr'g Tr. (Dec. 9, 2011) 13:4-12). Plaintiffs made that application. It was denied and that is an issue that should be decided at the trial of the companion case when EEEA will be fully represented.[3]

### B. Chapter 158 Does Not Apply to the Lechis

Even if this Court were to consider at this time whether Chapter 158 applies to the lechis, it should conclude that Chapter 158's proscription against any "encroachment or projection" does not apply to the lechis. *See* Quogue, N.Y., Village Code §§ 158-1, 158-2. Chapter 158's

---

[3] Although Quogue argues that EEEA was required to file an Article 78 proceeding, this Court has already ruled, correctly, that that was unnecessary. *See* Sugarman Decl. Ex. E (Hr'g Tr. (Feb. 4, 2013) 14:14-16, 15:1-2) (MS. DEJONG: Well, the plaintiff didn't continue that application. There's an appeal process, and that appeal process involves an Article 78 proceeding. . . . THE COURT: Counsel, I disagree with you. I think it is a final decision."); *see also Adrian v. Town of Yorktown*, 341 Fed. Appx. 699, 700 (2d Cir. 2009) (explaining that for purposes of the "finality prong of the ripeness test," plaintiffs "must obtain a final, definitive decision from local zoning authorities") (citation omitted); *cf. Wong v. Yoo*, 649 F. Supp. 2d 34, 72 (E.D.N.Y. 2009) (rejecting municipality's contention in § 1983 case that Article 78 proceeding was the only vehicle by which pendent state law claims could be brought against municipality).

own definition of "encroachment" as "[a]ny private use of any portion of a public right-of-way through any structure or device, whether upon, above, or under said right-of-way," *id.* at § 158-2, mandates such a conclusion. Specifically, Chapter 158 does not apply to the lechis for two reasons.

The sole basis of the decision of the Quogue Board of Trustees that Chapter 158 bars placement of the lechis on the poles is that they are "devices." The Board gave no rationale for this decision. It simply declared that they are devices. Chapter 158 does not define "device." *Merriam-Webster's Dictionary* defines the term as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." *Device Definition*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 2000). Given that the lechis are not "pieces of equipment" or "mechanisms," any argument that the lechis constitute "devices" under Chapter 158 is extinguished by the term's plain English meaning.[4]

Second, the lechis cannot be considered to be "upon [or] above . . . the right-of-way" because they measure a mere 5/8 of an inch in width. *See* Quogue, N.Y. Village Code § 158-2; *cf. East End Eruv Ass'n, Inc., et al. v. Village of Westhampton Beach, et al.*, 828 F. Supp. 2d 526, 541 (E.D.N.Y. 2011) (noting that "the applicability of Quogue's sign ordinance (governing

---

[4] Quogue has at times cited alternative definitions of "device" from free online dictionaries: (1) "a thing made for a particular purpose[; an invention or contrivance, especially a mechanical or electrical one]" (from Dictionary.com); and (2) "a contrivance or invention serving a particular purpose[, especially a machine used to perform one or more relatively simple tasks]" (from thefreedictionary.com). *See* Mem. of Law in Opp. To Pls.' Second Request for Prelim. Inj. on Behalf of Defendant Village of Quogue (ECF No. 172-53), at 13 n.3. The bracketed portions of these definitions, which Quogue conveniently omitted, confirm that a lechi does not fall within the "normal construction" of the term "device," as it is neither a "contrivance" nor a "device" that performs a "mechanical" or "electrical" function. Nor can Quogue rely on the purported "policy" justifications such as aesthetics or public safety. The lechis will not affect the beauty of the Village or the quality of life of its residents, nor has Quogue ever articulated an effect the lechis could have on public safety.

12

encroachments and projections on its rights-of-way) to the attachment of lechis to utility poles appears questionable"). In fact, Quogue's assumption that the lechis will be placed "upon [or] above . . . the right-of-way" violates basic rules of statutory construction. Courts have held that ordinances such as Chapter 158 "cannot be construed to prohibit putting upon a street any object without regard to its effect on the use of the street." *Wolff v. Dist. of Columbia*, 196 U.S. 152, 155 (1905); *see also Green v. Miller*, 249 N.Y. 88, 92, 96 (1928) (refuting the contention that the slightest encroachment over a street constitutes a public nuisance). Here, each lechi is a 5/8 inch half-round strip of plastic that would be tightly fastened to a given utility pole and would thus, at most, constitute a mere *de minimus* protrusion into the right-of-way. Not only are the lechis small and unobtrusive, but in many circumstances the lechis could not possibly have any practical effect on the public's use of the streets, as the lechis would be attached to poles that already have utility attachments on them that are far more bulky and obtrusive than the lechis. Indeed, any argument that the lechis are "upon [or] above . . . the right-of-way" also ignores the legal definition of a "public right-of-way" as "[t]he right of passage held by the public in general to travel on roads, freeways, and other thoroughfares." *Public Right-of-Way Definition*, BLACK'S LAW DICTIONARY (9th ed. 2009). The lechis do not in any way interfere with the public's ability to travel, nor has Quogue ever made that argument. As a result, the lechis cannot fall within the meaning of Chapter 158's definition of "encroachments" and, therefore, Chapter 158 does not apply.

13

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully join in the Verizon/LIPA Conclusions of Law and request that this Court issue a determination that Verizon and LIPA possess the authority under New York State law to license third-party attachments, including lechis, to their respective utility poles.

Dated:   New York, New York                    */s/ Robert G. Sugarman*
         March 21, 2013                        Robert G. Sugarman
                                               Yehudah L. Buchweitz
                                               WEIL GOTSHAL & MANGES LLP
                                               767 Fifth Avenue
                                               New York, NY 10153
                                               Telephone (212) 310-8000
                                               Facsimile (212) 310-8007
                                               robert.sugarman@weil.com
                                               Attorneys for *Amicus Curiae*