**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
VERIZON NEW YORK INC. and
LONG ISLAND LIGHTING COMPANY
d/b/a LIPA,

                          Plaintiffs,

                   - against -

THE VILLAGE OF WESTHAMPTON BEACH,
THE VILLAGE OF QUOGUE and
THE TOWN OF SOUTHAMPTON,

                          Defendants.
-------------------------------------------------------X

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

CV 11-252 (AKT)

## I.     PRELIMINARY STATEMENT

This case is one of three related actions[1] which, at their essence, involve the efforts of

certain Jewish residents on the East End of Long Island to establish an eruv – an unbroken

delineation of an area – which would allow members of the Jewish faith with certain religious

beliefs to carry or push objects from place to place within the area during the Sabbath and on

Yom Kippur.   Compl. ¶ 1; Joint Stipulation of Facts ("Joint Stip.") [DE 88] ¶ 2.   The

demarcation of the eruv may be created, for example, by using telephone poles, utility poles,

wires, and existing boundaries, and by attaching wooden or plastic strips, or "lechis," to the sides

of the poles.   *See* Joint Stip. ¶ 3.   Verizon New York, Inc. ("Verizon") and Long Island Lighting

Company d/b/a/ LIPA ("LIPA"), plaintiffs in the instant action, seek a declaratory judgment that

they "may permit lechis to be installed on their utility poles without incurring any fines or other

---

[1]   The other two actions are *East End Eruv, et al. v. Vill. of Westhampton Beach, et al.*,
No. CV 11-213 and *East End Eruv Association et al. v. Town of Southampton et al.*, No. CV 13-
4810.

legal sanctions and without any liability to the Defendants." Compl. ¶ 4. Both Verizon and

LIPA also ask the Court to enjoin the Defendants from "interfering in any way with, or otherwise

restricting or attempting to restrict, the installation of such lechis. . . ." *Id.*

Before the Court at this time are the parties' respective Findings of Fact and Conclusions

of Law on the sole issue of whether Plaintiffs Verizon and LIPA have authority to attach lechis

to their utility poles. Plaintiffs argue that they have such authority and may enter into private

contracts to facilitate the establishment of the eruv. Defendants the Village of Westhampton

Beach ("Westhampton Beach") and the Village of Quogue ("Quogue") (collectively,

"Defendants") argue that Plaintiffs do not have such authority.[2] This decision sets forth the

Court's ultimate findings of fact and conclusions of law on this singular issue.

## II.   PROCEDURAL BACKGROUND

In March 2010, the East End Eruv Association ("the EEEA"), a private organization, was

formed for the purpose of working to establish an eruv in Suffolk County. Joint Stip. ¶ 1. On

January 13, 2011, the EEEA and certain individual plaintiffs filed a Complaint in *East End Eruv,*

*et al. v. Vill. of Westhampton Beach, et al.*, No. CV 11-213 (the "EEEA Action"), asserting

violations of their constitutional rights by Westhampton Beach, Quogue, the Town of

Southampton, and a number of individual defendants, in allegedly preventing the establishment

of an eruv.[3] On January 15, 2013, Verizon and LIPA filed the instant action seeking declaratory

---

[2]   On February 4, 2013, this action was stayed as to defendant the Town of Southampton.
Electronic Order, Feb. 4, 2013. As such, the Town of Southampton has not made any
submissions regarding this issue.

[3]   Pursuant to stipulation, plaintiffs in the EEEA Action filed an Amended Complaint on
February 3, 2012, removing all of the individual defendants, among other things. *Id.* ¶ 4.
Further, Judge Wexler subsequently dismissed the Town of Southampton from the EEEA
Action, *see* Tr. of Feb. 4, 2013 Proceedings Before Hon. Leonard D. Wexler ("Feb. 4, 2013 Tr.")
at 9. Plaintiffs in the EEEA Action have since filed a Complaint against the Town of

and injunctive relief. Compl. ¶ 1. This action was designated as related to the EEEA Action. *See* DE 21; EEEA Action DE 30. Verizon and LIPA contend that they (i) own the utility poles at issue; (ii) are willing to allow the installation of the lechis to establish the eruv; and (iii) entered into agreements with EEEA to permit EEEA to install lechis on the utility poles. Compl. ¶ 2. However, according to Verizon and LIPA, Defendants have prohibited the attachment of the lechis, asserting that the attachment is either (i) not permitted; or (ii) requires prior approval pursuant to local laws that regulate the display of signs or that restrict intrusions on public rights of way. *Id.* ¶ 2. Verizon and LIPA seek a declaration that they may allow the installation of lechis on their utility poles without incurring any fines or other legal sanctions, and without any liability to the Defendants. *Id.* ¶ 4.

On February 4, 2013, Judge Wexler, who was then assigned to this case, scheduled a bench trial in this matter regarding the sole issue of Verizon and LIPA's authority to attach the lechis to the utility poles. Electronic Order, Feb. 4, 2013; DE 83. Pursuant to Judge Wexler's directives at the February 4, 2013 conference, the parties subsequently submitted a Joint Stipulation of Facts regarding Verizon and LIPA's authority to license attachments to their utility poles, along with memoranda and proposed conclusions of law. *See* Joint Stip. [DE 88]; Quogue's Conclusions of Law ("Quogue Mem.") [DE 89]; Westhampton Beach's Proposed Conclusions of Law ("Westhampton Beach Mem.") [DE 90]; LIPA's Proposed Conclusions of Law ("LIPA Mem.") [DE 91]; Verizon's Proposed Conclusions of Law ("Verizon Mem.") [DE 92]. Plaintiffs in the EEEA Action also filed an amicus "Statement in Support" of the proposed conclusions of law submitted by Verizon and LIPA. *See* Statement in Support of the

---

Southampton and the Town of Southampton Zoning Board of Appeals in *East End Eruv Association et al. v. Town of Southampton et al.*, No. CV 13-4810.

Proposed Conclusions of Law Submitted by Verizon New York, Inc. and Long Island Lighting Co., D/B/A LIPA ("EEEA Mem.") [DE 94].  Westhampton Beach moved to strike the "Statement in Support" as an improper submission by a non-party.  DE 95.  This Court denied the motion to strike but allowed Westhampton Beach to submit opposition to the Statement in Support.  DE 121.  The Court noted that "to the extent that the EEEA Action plaintiffs go beyond their proper role by attempting to present wholly new issues, the Court can remedy any possible prejudice to Westhampton Beach by simply declining to consider those issues."  *Id.* (internal quotations and alterations omitted) (citing *Onandaga Indian Nation v. New York*, No. 97-CV-445, 1997 WL 369389, at *2 (N.D.N.Y. June 25, 1997); *Concerned Area Residents v. Southview Farm*, 834 F. Supp. 1410, 1413 (W.D.N.Y. 1993).

After the parties filed their submissions, all counsel in this action and in the EEEA Action interposed a consent to the jurisdiction of a United States Magistrate Judge for all purposes, pursuant to 28 U.S.C. § 636(c).  *See* Verizon Action DE 98; EEEA Action DE 200.  The pending matters were then transferred to this Court.  *See* DE 100; EEEA Action DE 202.  At a status conference on November 8, 2013, counsel for all parties represented on the record that they wished to have this issue decided without a bench trial or oral argument.  DE 112.

III.   **FINDINGS OF FACT**

The Court turns then to the parties' Joint Stipulation of Facts and adopts those facts as part of the following findings:

1.      LIPA is a corporate municipal instrumentality and political subdivision of the State of New York.  LIPA was created pursuant to the LIPA Act adopted in 1986, which is found generally at N.Y. Pub. Auth. Law § 1020 ("the LIPA Act").  Joint Stip. ¶ 6 and Ex. A.

2.	The Village of Westhampton Beach is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.  Joint Stip. ¶ 7.

3.	The Village of Quogue is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.  Joint Stip. ¶ 8.

4.	Verizon is a telephone corporation organized under the laws of the State of New York that provides telephone services in New York State, including Long Island.  Joint Stip. ¶ 9.

5.	In March of 2010, the EEEA, a private organization, was formed for the purpose of working to establish an eruv in Suffolk County.  Joint Stip. ¶ 1.

6.	An eruv is a defined area which enables members of the Jewish faith with certain religious beliefs to carry and push objects within that area on the Jewish Sabbath and Yom Kippur.  Joint Stip. ¶ 2.

7.	The demarcation of the eruv the EEEA seeks to establish will be created, in part, by using telephone poles and wires, utility poles and wires, existing boundaries, and by attaching wooden or plastic strips, or lechis, to the sides of the poles.  Joint Stip. ¶ 3.

8.	The EEEA seeks to establish an eruv for the benefit of its members.  Joint Stip. ¶ 4.

9.	The EEEA requested that Verizon and LIPA allow the EEEA to use their utility poles to create an eruv by attaching lechis to certain utility poles.  Joint Stip. ¶ 5.

10.	To that end, the EEEA and Verizon entered into an "Eruv-Lechi Stave Agreement."  The EEEA signed the agreement on May 10, 2010, and Verizon signed the agreement on August 16, 2010.  Joint Stip. ¶ 10 and Ex. B.

11.	On or about June 13, 2011, the EEEA and Verizon entered into an updated Pole Attachment Agreement for Miscellaneous Attachments in order to provide for the attachment of

5/8 inch half-round PVC lechis, which will be no more than ten to fifteen feet in length, to certain of Verizon's utility poles within Westhampton Beach, Quogue, and the Town of Southampton.  Joint Stip. ¶ 11 and Ex. C.

12.     The EEEA has requested licenses from Verizon to attach lechis to, among other utility poles, three of Verizon's utility poles located on Dune Road in the Village of Westhampton Beach.  Joint Stip. ¶ 18.

13.     On or about July 27, 2010, the EEEA and LIPA entered into a License Agreement whereby LIPA agreed to allow the EEEA to affix lechis to certain of LIPA's poles, some of which are located within Westhampton Beach and Quogue.  Joint Stip. ¶ 12 and Ex. D.

14.     The lechis to be attached to Verizon's and LIPA's utility poles are 5/8 inch half-round strips of PVC that would measure no more than ten to fifteen feet in length and that would be indefinitely affixed vertically to the utility poles.  The strips would stretch up from the ground.  Joint Stip. ¶ 13.

15.     Verizon and LIPA would permit but not require – unless directed to do so by the Court – the lechis to be painted subject to LIPA's restrictions that poles may not be painted yellow or red.  The lechis could be visible, with the degree of visibility varying based on the observer's attentiveness and proximity to the poles.  Joint Stip. ¶ 14.

16.     Westhampton Beach and Quogue do not own the utility poles on which the lechis would be placed.  The utility poles on which the lechis would be placed belong to Verizon and LIPA.  Joint Stip. ¶ 15.

17.     Verizon and LIPA do not own the real property on which their utility poles stand. Some or all of the utility poles stand within the bounds of the public streets of the Village of

Westhampton Beach and the Village of Quogue, as the term "streets" is defined in New York Village Law § 6-600. Joint Stip. ¶ 16.

18.      The lechis proposed to be attached to Verizon's and LIPA's poles do not contribute to the generation or physical distribution of electricity, cable, telephone, internet, or other utility or communications service. Joint Stip. ¶ 17.

19.      Verizon has previously entered into license agreements with Westhampton Beach in order to "place and maintain certain decorative attachments" on Verizon's poles. Joint Stip. Exs. O, P, Q.

20.      In 1986, Quogue entered into a license agreement with the New York Telephone Company to allow Quogue to "maintain cables, equipment and facilities" on New York Telephone Company's poles. Decl. of Erica S. Weisgerber [DE 92-1] ("Weisgerber Decl."), Ex. 1.[4]

21.      LIPA has executed various agreements with organizations to allow temporary attachments to LIPA's utility poles, which ultimately may or may not have been actually attached. These include banners related to the Westhampton Beach St. Patrick's Day parade, the Holy Family Parish festival, the Don Scott Memorial Foundation run, the Plainedge Union Free School District budget vote, and the Town of Islip Earth Day Celebration. Of these examples, the Holy Family Parish festival, the Don Scott Memorial Foundation run, the Plainedge Union

---

[4]      According to Verizon, Quogue has refused to stipulate that the 1986 Pole Attachment Agreement has been executed. Verizon Mem. at 5 n.1. Verizon submits that the document is an undisputed fact; it was signed by Quogue's then-Mayor T. Decker Orr and is admissible into evidence as a party admission under Federal Rules of Evidence 801(d)(2). Verizon Mem. at 5 n.1. Verizon further argues that its language is unambiguous and can be interpreted as a matter of law. *Id.* If Quogue disputes the agreement's authenticity, Verizon maintains, the document may be authenticated by affidavit or live testimony. *Id.* Quogue has not addressed this issue in its papers. Upon examination of the document, and in light of the fact that Quogue has not disputed the agreement's authenticity with the Court, the 1986 Pole Attachment Agreement is deemed admitted.

Free School District budget vote, and the Town of Islip Earth Day Celebration did not take place in the Town of Southampton, and the corresponding attachment agreements did not involve utility or telephone poles in the Town of Southampton, which includes the incorporated villages of Westhampton Beach and Quogue. The Westhampton Beach St. Patrick's Day parade did not take place in Quogue and did not involve utility or telephone poles in Quogue. Joint Stip. ¶ 19 and Exs. E-I.

22.     The EEEA filed an application dated January 16, 2012 with the Quogue Village Board of Trustees to allow the placement of lechis on certain utility poles in Quogue. By decision dated May 18, 2012, the Board of Trustees unanimously denied the EEEA's application to attach lechis to utility poles in Quogue. Joint Stip. ¶ 20 and Ex. J.

23.     In 1949, the Westhampton Beach Board of Trustees adopted a resolution related to a request that the Long Island Lighting Company ("LILCO") had made to the Coast Guard seeking a Coast Guard permit to allow LILCO to install an aerial power crossing over the Quogue Canal. Joint Stip. ¶ 21 and Ex. K.

24.     The New York Telephone Company and the Village of Westhampton Beach have entered into various agreements regarding the installation or placement of new utility poles. Joint Stip. ¶ 22 and Exs. L, M.

25.     In 1910, the Town Board of the Town of Southampton ("Southampton Town Board") granted a franchise agreement to Riverhead Electric Light Company for the area west of Quantuck Creek. Joint Stip. ¶ 25 and Ex. R.

26.     In 1911, the Southampton Town Board granted to Patchogue Electric Light Company a franchise for the area west of the Speonk River. Joint Stip. ¶ 26 and Ex. S.

27.     In 1912, the Southampton Town Board consented to the transfer of the franchise from Riverhead Electric Light Company to either the Patchogue Electric Light Company or Suffolk Light Heat and Power Company.  Joint Stip. ¶ 27 and Ex. T.

28.     In 1917, the Southampton Town Board approved the assignment of the franchise to Long Island Lighting Company.  Joint Stip. ¶ 28 and Ex. U.

29.     In 1964, the Southampton Town Board approved the transfer of the franchise from Patchogue Electric Light Company to Long Island Lighting Company ("LILCO").  Joint Stip. ¶ 29 and Ex. V.

30.     The franchise agreement granted to Riverhead Electric Light Company, and subsequently assigned to LILCO sets forth the authorization for the franchise.  Joint Stip. ¶ 30 and Ex. R.

31.     LIPA acquired all of the common stock of LILCO.  LIPA acquired from LILCO all electric franchise and electric utility service responsibilities for all ultimate consumers of electricity within LILCO's former service territory.  Joint Stip. ¶ 31.

32.     Some or all of the poles that are proposed to be used for the eruv fall within the areas described in the Patchogue and Riverhead franchise agreements.  Joint Stip. ¶ 32.

33.     The Board of Trustees of the Village of Westhampton Beach adopted a resolution on November 7, 1938 regarding the restoration or replacement by the United States Coast Guard of certain utility poles on Dune Road.  Joint Stip. ¶ 33 and Ex. W.

34.     The Board of Trustees of the Village of Westhampton Beach adopted a resolution on December 1, 1952 regarding certain utility poles located on Dune Road.  Joint Stip. ¶ 34 and Ex. X.  To date, Verizon and the Village of Westhampton Beach have not located a signed

franchise or consent for the New York Telephone Company to take over and operate the pole line along Dune Road within the limits of the Village of Westhampton Beach.  Joint Stip. ¶ 34.

35.     The utility poles to which EEEA seeks to attach lechis include three of Verizon's utility poles located on Dune Road in Westhampton Beach.  Joint Stip. ¶ 35.

## IV.   CONCLUSIONS OF LAW

In their submissions, the parties discuss the relevant franchise agreements as well as state and local statutes and ordinances.  Below, the Court first summarizes the parties' arguments with respect to these issues, followed by an analysis of each argument in turn, and finally the Court's conclusions of law.

### A.     The Franchise Agreements

#### 1.     *Background: The Franchises*

As noted in Section II, *supra*, pursuant to the Transportation Corporations Law, the Town Board of the Town of Southampton granted a franchise agreement in 1910 to Riverhead Electric Light Company for the area west of Quantuck Creek.  *See* Joint Stip. ¶ 25 and Ex. R.  In 1911, the Town Board of the Town of Southampton granted to Patchogue Electric Light Company a franchise for the area west of the Speonk River.  *See* Joint Stip. ¶ 26 and Ex. S.  Riverhead Electric Light Company's franchise covers the area of Westhampton Beach and the part of the Town of Southampton that is proposed to be part of the eruv.  *See* Joint Stip. ¶¶ 25, 26, 32.  Both franchises were eventually transferred to LIPA after (i) the franchises were transferred from Riverhead Electric Light Company and Patchogue Electric Light Company to LILCO; and (ii) LIPA acquired all the common stock of LILCO and became the owner of LILCO's transmission and distribution facilities and all of LILCO's electrical franchises.  Joint Stip. ¶¶ 28, 29, 31 and Exs. U, V.

With respect to Verizon, in November 1938, two months after a 1938 hurricane destroyed most of the homes and other structures on Dune Road in Westhampton Beach, the U.S. Coast Guard requested and received a franchise to construct utility poles on Dune Road from the Village of Westhampton Beach, for the purpose of maintaining the circuits for the Coast Guard. Joint Stip. ¶ 33 and Ex. W. The franchise agreement stated that "[j]oint use of such poles by the New York Telephone Company and the Long Island Lighting Company shall be permitted by the U.S. Coast Guard." Joint Stip. ¶ 33 and Ex. W. In 1952, Westhampton Beach's Board of Trustees granted the New York Telephone Company a franchise to take over and operate the poles on Dune Road. Joint Stip. ¶ 34 and Ex. X.

## 2. The Parties' Arguments

Essentially, the parties disagree about the scope and applicability of the franchise agreements to Verizon and LIPA. First, Westhampton Beach argues that the franchises only confer LIPA and Verizon with the authority to "erect and maintain poles for the support of cross-arms, fixtures and wires and construct and maintain necessary pole lines for supplying electricity for heat, light and power to the inhabitants of said Town . . . ." Westhampton Beach Mem. at 5-6 (citing Joint Stip. ¶¶ 25, 30 and Ex. R). Westhampton Beach maintains that the controlling franchise agreements thus bar the utilities from entering into agreements for other purposes, *i.e.*, agreements allowing EEEA to attach lechis to the utility poles. Westhampton Beach Mem. at 6.

Westhampton Beach further notes that the franchise agreements contain no express power to assign or "sublicense" rights to the utility poles for any purpose. Westhampton Beach Mem. at 8. Even if the franchises can be sublicensed, Westhampton Beach contends, they cannot be sublicensed for private, as opposed to public, purposes. *Id.* (citing *Rhinehart v. Redfield*, 87 N.Y.S. 789, 791 (1904), *aff'd* 72 N.E. 1150 (N.Y. 1904) ("A franchise is a special

privilege conferred by government . . . . The grant of a franchise presupposes a benefit to the public and an equal right on the part of every member of such public . . . to participate in this benefit . . . .")). Westhampton Beach argues that the Court should view the franchises at issue here in the context in which they were issued, *i.e.*, the franchises were granted for the benefit of providing electricity and telephone services to the residents of Westhampton Beach. Accordingly, Verizon and LIPA's interests in the public property may not be conferred upon "a few select members of a private religious group" as opposed to the public in general. Westhampton Beach Mem. at 8-9.

In the case of Verizon, Westhampton Beach alternatively argues that the 1952 franchise to the New York Telephone Company is not applicable to Verizon. Westhampton Beach asserts that pursuant to N.Y. Village Law § 4-406, the grant of a franchise to a public service corporation must be executed and filed with the village clerk, and "such franchise shall not be operative for any purpose until so executed and deposited." Westhampton Beach Mem. at 7 (citing N.Y. VILLAGE LAW § 4-406 (McKinney 2014)). A copy must also be filed in the County Clerk's Office. Westhampton Beach Mem. at 7. *See* N.Y. VILLAGE LAW § 4-406. Neither Verizon nor Westhampton Beach has located a signed or executed copy of the 1952 franchise. Joint Stip. ¶ 34. Thus, Westhampton Beach argues, Verizon has no right to or interest in the utility poles on Dune Road under the 1952 franchise agreement, and cannot enter into an agreement with the EEEA regarding the attachment of lechis to those poles. Westhampton Beach Mem. at 7. Westhampton Beach further maintains that to the extent Verizon has any right to the utility poles on Dune Road, this right comes from the franchise agreement between the Village and the Coast Guard or from the Transportation Corporations Law. *Id.* In any case, Westhampton Beach claims that the franchise agreement must be construed against Verizon and

in favor of Westhampton Beach and that the franchise agreement, therefore, cannot be read to allow Verizon to enter into a contract with EEEA for the attachment of lechis to the utility poles. *Id.*

To the contrary, LIPA and Verizon argue that under New York law, a municipality does not have the right to dictate to the franchisee what it may or may not do with its own property — in this case, the utility poles. LIPA Mem. at 7 (citing *N.Y. Tel. Co. v. Town of North Hempstead*, 385 N.Y.S.2d 436 (N.Y. Sup. Ct. 1975) *aff'd mem.*, 385 N.Y.S.2d 505 (N.Y. App. Div. 2d Dep't 1976), *modified*, 363 N.E.2d 694 (N.Y. 1977)); Verizon Mem. at 1-3 (same).

In *North Hempstead*, the New York Telephone Company (the "Telephone Company") possessed a franchise to erect and maintain poles for its lines on the public streets and highways. *North Hempstead*, 385 N.Y.S.2d at 440-1. The Telephone Company sued the Town of North Hempstead (the "Town") for rent and injunctive relief when the Town attached its own street lighting fixtures to the Telephone Company's poles. *Id.* at 439-40. The Town argued that (i) the Telephone Company may only use its poles for telephone purposes, and (ii) the use of the poles for purposes other than that for which the Telephone Company was granted a special franchise is beyond the Telephone Company's powers. *Id.* at 440. The court rejected both arguments. *Id.* at 440-41. First, it rejected the Town's narrow construction of the franchise and observed that "there is no express prohibition against the use of the 'necessary fixtures' such as poles for purposes other than telephone communication." *Id.* at 441. Second, the court found that the Transportation Corporations Law made the plaintiff subject to the provisions of the Business Corporation Law, which granted the Telephone Company the right to "enter into contractual arrangements with others for the use of space on its poles." *Id.* The Court of Appeals ultimately held that the Telephone Company was entitled to a mandatory injunction directing removal of

the Town's fixtures and compensation for damages, because the Town's appropriation of the poles for its purposes constituted "a clear instance of a taking of private property for the use of the municipality." *North Hempstead*, 363 N.E.2d at 697, 699.

LIPA and Verizon maintain that the franchises they acquired contain no express provisions prohibiting the franchisee from licensing pole attachment rights. LIPA Mem. at 11. Further, Verizon points out that both Westhampton Beach and Quogue have entered into "Pole Attachment Agreements" with Verizon, evidencing the municipalities' acknowledgment that Verizon has control over its poles and may enter into licensing agreements for pole attachment rights. Verizon Mem. at 4 (citing Joint Stip., Exs. O, P, Q). Verizon also highlights the New York Court of Appeals' holding that a telephone company has an "unconditional right to erect and maintain poles for its lines upon public streets and highways" and that the company's telephone poles constitute personal property belonging to the utility. Verizon Mem. at 1-2 (citing *North Hempstead*, 41 N.Y.2d at 693). Further, LIPA argues, the Transportation Corporations Law's incorporation of the Business Corporation Law applies to all "transportation corporations," including "electric corporations" such as LILCO. LIPA Mem. at 8. Similarly, Verizon contends that it is a telephone corporation as defined by New York Transportation Corporations Law § 25. *Id.*

The court in *North Hempstead*, LIPA maintains, refused to impose limitations on the utilities' rights to use (or allow others to use) their utility poles. *Id.* Verizon contends that the contract between Verizon and EEEA only implicates the use of Verizon's own property and does not implicate the use of any other property, either public or private. Verizon Mem. at 4. Specifically, Verizon argues that even if a pole were subject to a franchise, the local municipality would have no right to limit the utility's use of the pole (including its right to enter into contracts

to allow others to use the pole) in the absence of an "express reservation" in the franchise itself. *Id.* at 6 (citing *North Hempstead*, 363 N.E.2d at 698; *N.Y. ex rel. Olean v. W. N.Y. & Pa. Traction Co.*, 108 N.E. 847, 847 (N.Y. 1915) (holding that when a franchise is granted, it becomes "property protected by the Constitution and, except for conditions attached to the consent, subject to regulation only under the police power")). Thus, Verizon and LIPA conclude, since the franchises at issue here provide no limits to the authority to maintain the poles, so long as the poles are being used for supplying electricity or telephone services, LIPA and Verizon's agreements with EEEA regarding the lechis are proper. LIPA Mem. at 10-12; Verizon Mem. at 4. Westhampton Beach counters, however, that *North Hempstead* does not address what (if anything) the New York Telephone Company may do with its telephone poles, but rather, limits what the municipalities may affirmatively do with the poles. Westhampton Beach Mem. at 12-13.

LIPA also notes that a single utility pole supports wires of different types, including electrical, telephone, and cable wires, owned by different entities (telephone company, electric authority, etc.). LIPA Mem. at 9. Consequently, it is reasonable to conclude that providing electrical, lighting, and telephone services depends on pole-sharing arrangements between separately franchised electric and telephone companies or with public authorities such as LIPA. *Id.* at 9-10. Therefore, if the Court were to narrowly construe the franchise agreements and find that each individual entity is limited to using its poles solely for its own basic services (*i.e.* Verizon-owned poles only for telephone service and LIPA-owned poles only for electricity), local municipalities could declare that current pole-sharing among these entities violates narrowly-construed franchise rights. *Id.* at 10. Moreover, such a ruling would call into question the validity of other pole attachments throughout LIPA's service area, including the banner and

holiday lighting attachments which LIPA has permitted on its poles. *Id.* (citing Joint Stip., Exs. E-I). Such a result is untenable, LIPA argues, and is inconsistent with the language of the franchises. LIPA Mem. at 12.[5] Quogue counters that examples of agreements with other organizations to *temporarily* allow the attachment of private objects to LIPA poles which are not located on the streets of the Village of Quogue lack any probative value. Counsel for Quogue goes on to assert that the mere fact that the agreements exist does not support a finding that they are legal or that LIPA has the authority to enter into such agreements. Quogue Mem. at 8. In any event, Quogue argues, these agreements were approved by the municipality. Quogue Mem. at 10.

Similarly, the EEEA Action plaintiffs maintain that eruvin have existed in scores of communities throughout the United States for more than a century without controversy, and that

_____

[5] As discussed more fully in Section III(C), *infra*, LIPA also argues that even if the franchise terms limited LILCO's authority to maintain its poles in some way, the subsequent LIPA Act has provided LIPA with new authority that is not subject to the franchise limits or to local ordinances. LIPA Mem. at 13. Further, as an alternative basis for sustaining its licensing agreement with EEEA, LIPA and Verizon argue that the Court may apply the doctrine of "apportionability," traditionally applied in easement law. LIPA Mem. at (citing *Hoffman v. Capitol Cablevision Sys., Inc.*, 383 N.Y.S.2d 674 (N.Y. App. Div. 1976)); 17 Verizon Mem. at 6 (same). In *Hoffman*, private landowners sued Capitol Cablevision over the company's placement of equipment on utility poles maintained on an existing easement given to electric and telephone companies. *Id.* at 676. In affirming a dismissal order, the Appellate Division held that the electric and telephone companies had "exclusive easements in gross which were properly apportioned to defendant without compensation to [the servient property owners]" and without requiring the owners' consent. *Id.* at 678. LIPA and Verizon argue that they exclusively own their poles, which is functionally equivalent to the "exclusive easement in gross" over private property found in *Hoffman*. LIPA Mem. at 18; Verizon Mem. at 6. Further, the utilities argue, as in *Hoffman*, the attachments at issue here would not impose any burdens on Westhampton Beach or Quogue's rights-of-way beyond those already imposed attendant to the original franchise grants. *Id.* And like the easements issued in *Hoffman*, a franchise which permits pole installations does not depend on the franchisee (in this case, the EEEA) being extended an ownership of specific real property. *Id.* After examining these arguments, the Court concludes that the analogy to *Hoffman* here is too tenuous and the Court declines to issue any findings on this alternative theory.

a finding that the utilities cannot license third-party attachments to their poles could cause those arrangements to be invalidated. EEEA Mem. at 2-8. The EEEA Action plaintiffs also argue that an adverse determination by the Court on the question of the utilities' authority would result in a continuation of the burden on plaintiffs' sincerely-held religious beliefs and practices.[6] *Id.* at 8-10. In response,[7] Westhampton Beach argues that there is no basis in the record to support the EEAC Action plaintiffs' contentions.[8]

### 3. Analysis

Having carefully reviewed and considered the franchise documents, the Court finds that there is nothing in the franchises which expressly limits the utilities' powers to attach lechis or other items to their utility poles, or to "sublicense" rights to their poles for any purpose. For example, the franchise granted to the Riverhead Electric Light Company (later obtained by LIPA) grants the utility the "privilege and right to erect and maintain poles for the support of

---

[6]  In addition, in the EEEA Action, the plaintiffs bring to the Court's attention a recent decision by the United States Supreme Court in *Greece v.* Galloway, --- U.S. ---, 134 S. Ct. 1811 (2014), dealing with the interpretation of the Establishment Clause. *East End Eruv, et al. v. Village of Westhampton Beach, et al.*, CV 11-213, DE 251. The Court interprets this submission, filed in a completely different action, as an entreaty to expeditiously reach a decision on the primary briefs in the instant case, as opposed to proffering any substantive discussion on the grounds raised in those briefs. Accordingly, the Court elects not to consider EEEA's submission for purposes of reaching its decision here.

[7]  Westhampton Beach filed its opposition brief to the EEEA Action plaintiffs' amicus brief in the separate case of *East End Eruv, et al. v. Village of Westhampton Beach, et al.*, CV 11-213, DE 250.

[8]  The arguments raised in the EEEA Action plaintiffs' amicus brief, which may prove to be relevant to the overall claims in this case in the future, are extraneous to the fundamental issue being decided by the Court based on the submissions made in response to Judge Wexler's directive and Order. These arguments are outside the scope of the issues to be examined here and, therefore, the Court will not consider them. *See Onandaga Indian Nation*, 1997 WL 369389, at *2; *Concerned Area Residents*, 843 F. Supp. at 1413.

cross-arms, fixtures and wires and construct and maintain necessary pole lines for supplying

electricity for heat, light and power . . . ." *See* Joint Stip., Ex. R.  There is nothing in this

document limiting the right of Riverhead Electric Light Company to attach lechis or other items

(*i.e.* signs, banners, etc.) to its utility poles.  Nor is there any language in any of the other

franchise documents (Joint Stip. Exs. S-W) conveying such limitation.  As such, the Court will

not "read in" a provision into the franchises limiting the utilities' powers to attach lechis or other

items to their poles.  *See, e.g., In re World Trade Ctr. Disaster Site Litig.*, --- F.3d ---, 2014 WL

2565821, at *6 (2d Cir. June 9, 2014) ("Courts should be 'extremely reluctant,' . . . to imply a

term that 'the parties have neglected to specifically include.'") (quoting *Vt. Teddy Bear Co. v.

538 Madison Realty Co.*, 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 807 N.E.2d 876 (2004) (quoting

*Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72, 412 N.Y.S.2d 827, 385 N.E.2d 566

(1978)); *Bank of N.Y. v. Tyco Int'l. Grp., S.A.*, 545 F. Supp. 2d 312, 322 n.72 (S.D.N.Y. 2008)

(declining to impose provision not expressly stated in the parties' contract) (citing *Lui v. Park

Ridge at Terryville Assn.*, 196 A.D.2d 579, 601 N.Y.S.2d 496, 498 (N.Y App. Div. 2d Dep't

1993) ("A court should not, under the guise of contract interpretation, 'imply a term which the

parties themselves failed to insert' or otherwise rewrite the contract.")); *Bar-Ayal v. Time

Warner Cable Inc.*, No. 03 CV 9905, 2006 WL 2990032, at *14 n.25 (S.D.N.Y. Oct. 16, 2006)

(stating that under New York law, a court is "not free to alter the plain terms of an agreement or

to strain language beyond its reasonable and ordinary meaning.") (internal quotations omitted)

(citing *Shaw Grp. Inc. v. Triplefine Int'l Corp.,* 322 F.3d 115, 124 (2d Cir. 2003)); *Beacon Hill

CBO, II, Ltd. v. Beacon Hill Asset Mgmt. LLC*, 314 F. Supp. 2d 205, 213 (S.D.N.Y. 2003)

(noting that the parties specifically set forth terms for termination in agreement and could have

inserted a cure provision, but because the parties did not insert such provision the court declined

to find that the term was implied) (citing *Charter Realty & Dev. Corp. v. New Roc Assocs., L.P.,* 293 A.D.2d 438, 439, 739 N.Y.S.2d 456 (N.Y. App. Div. 2d Dep't 2002) ("[A] court should not, under the guise of contract interpretation, imply a term which the parties themselves failed to insert . . . ."); *accord North Hempstead*, 385 N.Y.S.2d at 440-41 (finding no express prohibition in statute against the use of telephone poles for purposes other than telephonic communication, and, therefore, use of the poles for other purposes was permissible).

Moreover, the parties' discussion of *North Hempstead* is instructive. The Court in *North Hempstead* held as follows:

> The defendants urge in their memorandum submitted on these motions . . . that the plaintiff may only use its poles for telephone purposes and that the use of the poles for purposes other than that for which the plaintiff was granted a special franchise under section 27 of the Transportation Corporations Law is beyond its powers. This argument lacks merit. The thrust of this claim is that the special franchise granted to plaintiff by section 27 of the Transportation Corporations Law gives the plaintiff the right to erect, construct and maintain the necessary fixtures for its telephone lines in the public roads, streets and highways. It is argued further that the words "necessary fixtures" can only relate to plaintiff's use of telephone lines for telephone purposes as indicated by the definition of a telephone company contained in section 25 of the Transportation Corporations Law. Therefore, the argument runs, the plaintiff's special franchise permitted it to use public streets only for the purpose of providing telephone service and for no other purpose. This narrow construction of the statute granting the special franchise is not supported by the statute's language. That is to say, there is no express prohibition against the use of the "necessary fixtures" such as poles for purposes other than telephonic communication. Moreover, the plaintiff's certificate of incorporation contains a grant of power to use its equipment for purposes other than providing telephonic communication. In addition, as a result of subdivision (a) of section 4 of the Transportation Corporations Law making the plaintiff subject to the provisions of the Business Corporation Law, the plaintiff possesses the right to enter into contractual arrangements with others for the use of space on its poles pursuant to the powers granted in subdivision (a) of section 202 of the Business Corporation Law.

*See North Hempstead*, 385 N.Y.S.2d at 440-41. As outlined above, the Court found that there was no express provision in the franchise granted to the New York Telephone Company which limited the use of the telephone poles to solely telephonic communication. *Id.* Again, the court found that the municipality's use of the telephone poles — owned by the New York Telephone Company — constituted a taking. *Id.* at 443. More specifically, the court held that the Town of North Hempstead did not have the right to attach its street lighting fixtures to the New York Telephone Company without the company's permission. *Id.* Further, the court noted that the utility had the right to "enter into contractual arrangements with others for the use of space on its poles." *Id. North Hempstead* does not address, however, what limitations, if any, a municipality may place upon those contracts.

The Court points out that *North Hempstead* relies on the Transportation Corporations Law for the proposition that the plaintiff possesses the right to enter into contractual arrangements with others for use of space on its poles. *See* 385 N.Y.S.2d at 440-41. In particular, Section 4 of the Transportation Corporations Law states that the Business Corporation Law applies to corporations regulated by the Transportation Corporations Law. *See* N.Y. Transp. Corp. Law § 4 (McKinney 2014). The Business Corporation Law grants corporations the authority to make contracts. N.Y. Bus. Corp. Law. § 202(a)(7) (McKinney 2014). LIPA appears to rely on *North Hempstead* to support the proposition that LIPA is permitted to make contracts with private parties to use its utility poles. LIPA Mem. at 8. However, as discussed more fully in Section III(C), *infra*, LIPA also argues that the Transportation Corporations Law does not apply to it, because it is not a "corporation" as defined by the statute. LIPA cannot have it both ways. Notwithstanding LIPA's dual position, even if LIPA's power to enter into contracts for the use of its poles is not supported by the rulings in *North Hempstead* -- because

that case only discussed the franchise as applied to a corporation as defined under the Transportation Corporations Law -- the Court will not read an express prohibition into the franchise agreements. *Bank of N.Y.*, 545 F. Supp. 2d at 322; *Lui*, 601 N.Y.S.2d at 498; *Bar-Ayal*, 2006 WL 2990032, at *14 n.25; *Shaw Group*, 322 F.3d at 124; *Beacon Hill*, 314 F. Supp. 2d at 213; *Charter Realty*, 739 N.Y.S.2d at 457.

The Court also notes that both Westhampton Beach and Quogue have previously entered into licensing agreements regarding the utility poles with Verizon or its predecessor, the New York Telephone Company. *See* Joint Stip. Exs. O, P, Q; Weisgerber Decl., Ex. 1. For example, the 1986 Pole Attachment Agreement between the New York Telephone Company and Quogue states that the New York Telephone Company "is willing to permit" Quogue to "place and maintain cables, equipment, and facilities" on the utility's poles. Weisgerber Decl., Ex. 1 at 1. The 1986 Agreement also recognized the New York Telephone Company's right to enter into agreements with others regarding the use of their utility poles. *Id.* at 4. Similarly, the 2008 "Pole Attachment Agreement for Miscellaneous Attachments" between Verizon and Westhampton Beach contains an express acknowledgement of Verizon's right "to grant, renew, and extend rights and privileges to others not parties to this Agreement, by contract or otherwise, to use any poles and/or anchors covered by this Agreement." Joint Stip., Ex. O. The 2008 Pole Attachment Agreement also states that Westhampton Beach, the "Licensee," desires to "place and maintain certain decorative attachments" on Verizon's poles. *Id.* at 1. The Agreement further provides that Verizon, the "Licensor," is "willing to permit" the placement of the attachments. *Id.* The Licensor is also defined as the "owner and custodian of a pole, and the only party permitted to issue a license for that pole." *Id.* The Licensee is "the party responsible for compliance with Licensor's regulations regarding such accommodations." *Id.* According to

Exhibit A to the 2008 Pole Attachment Agreement, Verizon permitted Westhampton Beach to attach banners to four telephone poles. Joint Stip., Ex. O.

The existence of these agreements indicates that Westhampton Beach and Quogue have previously been willing to enter into contracts with Verizon and its predecessor to facilitate the attachment of items to utility poles. Thus, the municipalities' contention that the franchise agreements bar the utilities from entering into agreements for other than utility purposes, *i.e.*, the facilitation of electricity for heat, light, and power, is belied by the fact that the municipalities themselves have entered into licensing agreements for purposes other than the provision of electricity, such as for the attachment of banners. Importantly, however, all of these agreements contain a provision that the agreements are subject to "all laws, ordinances, and regulations which in any manner affect the rights and obligations of the parties." Joint Stip., Ex. O, P; Weisgerber Decl. Ex. 1 at 4. Therefore, there is at least some acknowledgment in the agreements that applicable laws and ordinances, if any, may limit the rights of the parties to the agreements, as discussed more fully in Section III(D), *infra*.

Moreover, LIPA has entered into several agreements with private parties for the attachment of signs or banners on their utility poles. Joint Stip. ¶ 19. One of these agreements involved an attachment to utility poles in Westhampton Beach (related to the Westhampton Beach St. Patrick's Day Parade). *Id.* Quogue argues that these types of agreements have been "approved" by the municipalities. Quogue Mem. at 10. Nothing in these agreements, however, indicates that they have been approved by the municipality. For example, the Court has reviewed the "Application for Permission to Attach or Use Poles Located in Public Streets or Public Places" related to the Westhampton Beach St. Patrick's Day Parade. Joint Stip., Ex. E. The application is signed by (i) Tim Lane of the Westhampton Beach St. Patrick's Day Parade

Committee, (ii) Seth Allen of Chesterfield Associates, the contractor apparently responsible for installing the attachments; and (iii) Christopher Braglia, on behalf of LIPA. *Id.* No representative from the municipality signed the application. *See id.* Further, the application states that "LIPA reserves the right to approve the content of all banners and the bracket attachment." *Id.* No similar clause is included regarding municipal approval. Nor have the municipalities introduced any documentation showing that the application was approved by the municipality. Thus, it appears that, at least in Westhampton Beach, LIPA has previously entered into a contract with a private entity for the attachment of items to its utility poles (unrelated to the purposes of providing electricity), without prior municipal approval.[9]

---

[9] As noted, Westhampton Beach also argues that, even if the franchises can be sublicensed, they cannot be sublicensed for "private" as opposed to "public" purposes, and that Verizon and LIPA's interest in public property may not be conferred upon "a few select members of a private religious group" as opposed to the public in general. Westhampton Beach Mem. at 8-9. However, the case relied upon by Westhampton Beach for support of its proposition, *Rhinehart*, 87 N.Y.S. at 789, is inapposite. There, the court struck down a municipal corporation's grant of power to a private corporation to open up the public streets and other public places to install pipes for the purpose of creating a refrigeration system that would benefit the private corporation and a "limited number" of private individuals in a "limited district." *Id.* The court found that the grant constituted an *exclusive* interest in the streets. *Id.* Specifically, the court held that the grant to the private corporation constituted "a special privilege to individuals, involving not alone the right to put in pipes, conduits, etc., but the right to perpetually maintain them, and to have an exclusive interest in the streets for the purpose of carrying on the private business of the relators; it is not a delegation of the power to grant to individuals a right of property in the highways held in trust for the public." *Id.* Here, the licensing agreements at issue, by their terms, do not create "an exclusive interest in the streets" or confer a property right.

Moreover, imposing a requirement that any attachment to any utility pole be undertaken for a "public purpose" would not be logical or practical. For example, under this narrow interpretation, a utility would need to ensure that any attachment to its poles benefitted the "public." But how should "public" as opposed to "private" purposes be defined? What number of people need to benefit from the licensing agreement in order for such an agreement to constitute a "public" purpose? And how would that number be determined? Would the agreement permitting advertisements for the Westhampton Beach St. Patrick's Day Parade be defined as constituting a "public" purpose? Would Verizon or LIPA need to measure how many individuals in the municipality are Irish prior to entering into such an agreement? The Court will

23

Based on the foregoing analysis, the Court finds that the franchise agreements do not limit LIPA or Verizon's authority to enter into contracts regarding the use of their utility poles for purposes unrelated to the provision of electricity or telephone services. Finally, with respect to Westhampton Beach's argument that the 1952 franchise agreement does not apply to Verizon since it was not appropriately filed, even if the franchise agreement does not apply to Verizon, the Transportation Corporations Law provides Verizon with sufficient authority to enter into private contracts to attach items to its utility poles, as outlined below.[10]

**B.     The Transportation Corporations Law**

The parties also dispute what limitations the Transportation Corporations Law imposes on Verizon and LIPA's ability to enter into agreements allowing the attachment of lechis to their utility poles.

***1.     Background: The Transportation Corporations Law***

The Transportation Corporations Law reads, in relevant part, as follows:

> 3.     An electric corporation and a gas and electric corporation shall have power to generate, acquire and supply electricity for heat or power in cities, towns and villages within this state, and to light the streets, highways and public places thereof, and the public and private buildings therein; and to make, sell or lease all machines, instruments, apparatus and other equipment therefor, and for transmitting and distributing electricity, to lay, erect and construct suitable wires or other conductors, with the necessary

---

not impose such an amorphous rule. However, this is not to say that municipalities may not pass ordinances restricting attachments on utility poles in order to protect the health, safety, morals, or general welfare of their residents, as outlined in Section III(D), *infra.*

[10]     While the Court appreciates LIPA's and the EEEA Action plaintiffs' policy concerns regarding the impact of a finding construing the franchises narrowly, *i.e.*, that such a ruling would call into question pole-sharing agreements (i) among the utilities and (ii) between the utilities and private parties, specifically, other religious groups for the establishment of eruvin elsewhere, the Court need not rely on these arguments to find that the franchise agreements do not limit Verizon and LIPA's authority to make contracts for the attachment of items to their poles for non-utility purposes.

poles, pipes or other fixtures in, on, over and under the streets, avenues, public parks and places in such cities, towns or villages, with the consent of the municipal authorities thereof, and in such manner and under such reasonable regulations, as they may prescribe.

. . . .

3-b.   The construction, use and maintenance by an electric corporation of transmission, distribution and service lines and wires in, over or under any street, highway or public place and the construction, use and maintenance by a gas corporation of transmission, distribution and service pipes, conduits, ducts or other fixtures in, over or under any trees, highway or public place, as may be necessary for its corporate purpose, are hereby declared to be public uses and purposes.

N.Y. Transp. Corp. Law § 11.

Further, Transportation Corporations Law Section 27, pertaining to

telegraph and telephone corporations, provides:

Any such corporation may erect, construct and maintain the necessary fixtures for its lines upon, over or under any of the public roads, streets and highways; and through, across or under any of the waters within the limits of this state, and may erect, construct and maintain its necessary stations, plants, equipment or lines upon, through or over any other land, subject to the right of the owners thereof to full compensation for the same . . . .

Any such corporation is authorized, from time to time, to construct and lay lines of electrical conductors under ground in any city, village or town within the limits of this state, subject to all the provisions of law in reference to such companies not inconsistent with this section; provided that such corporation shall, before laying any such line in any city, village or town of this state, first obtain from the common council of cities, or other body having like jurisdiction therein, the trustees of villages, or the town superintendents of towns, permission to use the streets within such city, village or town for the purposes herein set forth. Nothing in this section shall limit, alter, or affect the provisions or powers relating or granted to telegraph corporations heretofore created by special act of the legislature of this state, except in so far as to confer on any such corporation the right to lay electrical conductors under ground.

N.Y. Transp. Corp. Law § 27.

Finally, Section 4 of the Transportation Corporations Law makes the Business Corporation Law applicable to any corporation formed under the Transportation Corporations Law. N.Y. Transp. Corp. Law § 4 ("The business corporation law applies to a corporation heretofore or hereafter formed under this chapter . . . .").

### 2. The Parties' Contentions

Westhampton Beach and Quogue argue that the Transportation Corporations Law grants the utilities the privilege to construct, use or maintain their lines for purposes of transmitting and distributing electricity, and not for other unrelated purposes. Quogue Mem. at 5-6; Westhampton Beach Mem. at 13. Westhampton Beach maintains that the Transportation Corporations Law only applies to the "construction" and the "installation" of equipment, and the poles at issue on Dune Road have already been constructed and installed by the Coast Guard. *Id.* Quogue contends that the statute was not intended to permit the utilities to license portions of the poles — erected and maintained on public land — for private use. *Id.* at 6. Further, Westhampton Beach asserts that the Transportation Corporations Law does not trump the franchise agreements granted to LIPA and Verizon, which limit the use of the utility poles. Westhampton Beach Mem. at 14. Westhampton Beach also contends that the exercise of the powers outlined in the Transportation Corporations Law require the "consent of the municipal authorities" and that LILCO, LIPA's predecessor, has previously acknowledged the authority of Westhampton Beach in such matters, including by seeking authorization from the Board of Trustees of Westhampton Beach to construct an aerial power crossing over Quogue Canal and Jessup Lane. *Id.* at 17 (citing Joint Stip. ¶ 21 and Ex. K). Verizon counters that, by law, telephone and telegraph

corporations must obtain municipal approval only if new transmission lines "are to be placed underground," which is not the case here. Verizon Mem. at 4.

Further, as a general matter, Westhampton Beach argues that the grant by the government of a right to a private entity must be strictly construed against the grantee. Westhampton Beach Mem. at 13 (citing *Nw. Fertilizing Co. v. Vill. of Hyde Park*, 97 U.S. 659, 666 (1878) ("The rule of construction in this class of cases is that it shall be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear.")). Construing Transportation Corporations Law § 27 against Verizon and LIPA, therefore, Westhampton Beach contends that there is no interpretation which would permit Verizon and LIPA to allow private entities to attach private objects to public utility poles for private purposes. Westhampton Beach Mem. at 13.

Verizon points out that the New York Court of Appeals has confirmed that, pursuant to Section 27 of the Transportation Corporations Law, "telegraph and telephone companies derive the right to erect their poles and string their wires directly from the state" and not from local municipalities. Verizon Mem. at 1 (citing *Vill. of Carthage v. Central N.Y. Tel. & Tel. Co.*, 78 N.E. 165, 165-6 (N.Y. 1906)). Verizon states that it is a telephone corporation as defined by New York Transportation Corporations Law § 25, and, as such, it may "erect, construct and maintain its necessary stations, plants, equipment or lines." Verizon Mem. at 1.

Finally, LIPA maintains that the Transportation Corporations Law does not apply to LIPA because it is not a "corporation" as defined by the statute. LIPA Mem. at 6 (citing *Buell v. Herkimer*, 280 N.Y.S. 253 (N.Y. App. Div. 4th Dep't 1935) (a municipal commission authorized to supply power to a village is not a "corporation subject to Transportation Corporations Law")).

###### 3.    *Analysis*

Under the Transportation Corporations Law, a "telephone corporation" is a corporation "organized to construct, own, use and maintain a line or lines of electric telephone wholly within or partly without the State, or to acquire and own any interest in any such line or lines, or any grants therefor or for any or all such purposes."  N.Y. TRANSP. CORP. LAW § 25.  Clearly, Verizon is a "telephone corporation" under the Transportation Corporations Law, and, consequently, the statute applies to Verizon.

As noted, LIPA maintains that the Transportation Corporations Law does not apply to it because it is not a "corporation" as defined by the statute.  LIPA Mem. at 6 (citing *Buell*, 280 N.Y.S. at 253 (a municipal commission authorized to supply power to a village is not a "corporation subject to Transportation Corporations Law")).  Transportation Corporations Law Section 10 defines "electric corporation" as "a corporation organized to manufacture, to produce or otherwise acquire, and to supply for public use electricity for light, heat or power, and for lighting streets, avenues, public parks and places and public and private buildings of cities, villages and towns within the state."  N.Y. TRANSP. CORP. LAW § 10.  In contrast, LIPA is a "body corporate and politic and a political subdivision of the state, exercising essential government and public powers."  Joint Stip., Ex. A; N.Y. PUB. AUTH. LAW § 1020-c(1) (McKinney's 2012) ("[T]here is hereby created a corporate municipal instrumentality of the state to be known as the 'Long Island power authority,' which shall be a body corporate and politic and a political subdivision of the state, exercising essential governmental and public powers.").  The Court could find no case law applying the Transportation Corporations Law to LIPA.  Therefore, in light of the statutory language defining LIPA as a "subdivision of the state," the Transportation Corporations Law does not appear to be applicable to LIPA.  Rather, LIPA is

more appropriately governed by N.Y. PUB. AUTH. LAW § 1020-a, *et seq.*, the statute which created LIPA, as outlined more fully in Section III(C), *infra*. As such, the Court will examine the Transportation Corporations Law only in the context of Verizon's authority to enter into private contracts for use of its utility poles.

With respect to the municipalities' first argument, namely, that the Transportation Corporations Law was not intended to permit Verizon to license portions of its poles for private use, the Court finds no language in the statute prohibiting such use. *See* N.Y. TRANSP. CORP. LAW § 1, *et seq.* Further, the municipalities have not pointed to any materials regarding the legislative background of the statute which confirms an intent to restrict such use of the poles. Moreover, at least one court has found that a corporation defined as such under the Transportation Corporations Law "possesses the right to enter into contractual arrangements with others for the use of space on its poles." *See North Hempstead*, 385 N.Y.S.2d at 440-1. Further, as to Westhampton Beach's argument that the Transportation Corporations Law does not trump the franchise agreements, the Court has already examined the franchise agreements and found that they do not limit the utilities' ability to enter into private contracts regarding the use of their utility poles, even in cases where those contracts do not relate to the provision of telephone or electricity services. *See* Section III(A), *supra*.

Westhampton Beach also argues that, pursuant to *Nw. Fertilizing Co.*, a grant by the government of a right to a private entity must be strictly construed against the grantee. As a result, Westhampton Beach asserts, there is no interpretation which would permit Verizon and LIPA to allow private entities to attach private objects to public utility poles for private purposes. Westhampton Beach Mem. at 13. However, the language relied upon by Westhampton Beach to support this proposition is from the dissenting opinion in that case. *Nw. Fertilizing Co.*, 97 U.S.

at 675. Moreover, *Nw. Fertilizing Co.* does not address the Transportation Corporations Law nor the question of whether utility companies may enter into private contracts for use of their poles. *Nw. Fertilizing Co.* involved the question of whether a municipality could exercise its police powers to protect its citizens from the nuisance caused by a fertilizer plant where the state legislature had permitted the plant to operate for 50 years. *Id.* at 664-66. There, the Supreme Court sustained the municipal ordinance as a valid exercise of the municipality's police power, even where the ordinance adversely impacted the operations of the plant. *See id.* at 668.[11] While this case may relate to Quogue and Westhampton Beach's ability to regulate the utilities' poles pursuant to their police powers, the case does not answer the question whether the utilities may enter into private contracts to facilitate the attachment of objects to their utility poles, nor how the Transportation Corporations Law impacts any such right. Moreover, as previously discussed in Section III(A), *supra*, corporations as defined under the Transportation Corporations Law are also subject to the Business Corporation Law which permits Verizon to enter into contractual

---

[11] Specifically, the Northwestern Fertilizing Company was created by the Illinois legislature of Illinois in 1867 via charter, and was permitted to operate for 50 years in a then swampy and uninhabitable territory of Cook County, within the bounds of Hyde Park. *Nw. Fertilizing Co.* 97 U.S. at 663. In 1869, the Illinois legislature revised the charter of Hyde Park, granting it the "largest powers of police and local government" and permitting it to "define or abate nuisances which are, or may be, injurious to the public health." *Id.* at 664-65. Hyde Park then passed an ordinance providing that "[n]o person shall transfer, carry, haul, or convey any offal, dead animals, or other offensive or unwholesome matter or material, into or through the village of Hyde Park." *Id.* at 663. The ordinance was passed primarily because the fertilizing company was viewed as a nuisance which created an "intolerable" stench, "producing nausea, discomfort, if not sickness to the people . . . ." *Id.* at 664. The Supreme Court found that, notwithstanding the state's charter authorizing the fertilizing company to operate for 50 years, that charter did not exempt the company "for fifty years from the exercise of the police power of the State, however serious the nuisance might become in the future, by reason of the growth of population around it." *Id.* at 668. The Court found that the owners of the fertilizer company "had no such exemption before they were incorporated, and we think the charter did not give it to them." *Id.* Thus, the Court sustained Hyde Park's ordinance as a valid exercise of the state's police power. *See id.*

arrangements with others for the use of space on its poles.  *See North Hempstead*, 385 N.Y.S.2d at 440-1; N.Y. BUS. CORP. LAW § 202(a)(7).

Westhampton Beach also argues that the exercise of the powers outlined in the Transportation Corporations Law requires the "consent of the municipal authorities."  The Court has reviewed the statute and finds that, while some of the powers outlined in the Transportation Corporations Law require the consent of the municipal authorities, there is nothing in the statute restricting the ability of Verizon to enter into private contracts for the attachment of items to its utility poles.  For example, Section 27 of the Transportation Corporations Law requires that telegraph and telephone corporations obtain permission to lay electric lines "under ground." N.Y. TRANSP. CORP. LAW § 27 ("Any such corporation is authorized, from time to time, to construct and lay lines of electrical conductors under ground . . . provided that such corporation shall, before laying any such line . . . obtain from the common council of cities, or other body having like jurisdiction therein, the trustees of villages, or the town superintendents of towns, permission to use the streets within such city, village or town for the purposes herein set forth."). *See City of Rome v. Verizon Comms., Inc.*, 362 F.3d 168, 171 (2d Cir. 2004) (quoting N.Y. TRANSP. CORP. LAW § 27); *Staminski v. Romeo*, 310 N.Y.S. 2d 169, 171 (N.Y. Sup. Ct. 1970) ("Section 27 of the Transportation Corporations Law gives telegraph and telephone corporations broad powers to construct their lines and fixtures over or under public highways, and to utilize private lands for their purposes, with the right to condemn such lands if necessary. The section requires however that telegraph and telephone corporations must obtain the permission of city, village or town authorities to use local streets for the construction of its lines.").  Section 11, applicable to gas and electric corporations, requires municipal approval when those corporations wish to lay wires over or under the streets or public parks.  N.Y. TRANSP. CORP. LAW § 11 ("An

electric corporation and a gas and electric corporation shall have power . . . to lay, erect and construct suitable wires or other conductors, with the necessary poles, pipes or other fixtures in, on, over and under the streets, avenues, public parks and places in such cities, towns or villages, with the consent of the municipal authorities thereof, and in such manner and under such reasonable regulations, as they may prescribe."). Therefore, the language of the statute generally requires municipal approval for (i) the installation of electrical wires underground, in the case of Verizon (or other telephone or telegraph companies), and (ii) the erection of wires or other conductors over or underground, in the case of electric and gas corporations. N.Y. Transp. Corp. Law §§ 11, 27. There is no language in the Transportation Corporations Law limiting a corporation's ability to enter into private contracts for the use of its poles. Rather, as discussed further on in this decision, the Transportation Corporations Law subjects Verizon to the Business Corporation Law, which provides a sufficient basis for the utility to enter into contractual arrangements with others for the use of space on its poles. *See North Hempstead*, 385 N.Y.S.2d at 440-1; N.Y. Bus. Corp. Law § 202(a)(7). As observed in Section II(B), *supra*, the municipalities themselves have entered into such contracts, as have private groups. *See* Section II(B), *supra.*

### C. The LIPA ACT

In 1986, the New York State Legislature created LIPA "to replace the privately owned Long Island Lighting Company and provide an adequate supply of electricity in a reliable, efficient, and economic manner to consumers in Nassau County, Suffolk County, and a portion of Queens County." *In re Long Island Power Auth. Ratepayer Litig.*, 47 A.D.3d 899, 850 N.Y.S.2d 609 (N.Y. App. Div. 2d Dep't 2008) (citing N.Y. Pub. Auth. Law §§ 1020-a, 1020-b(17)); *see Town of Islip v. Long Island Power Auth.*, 301 A.D.2d 1, 4, 752 N.Y.S.2d 320, 322

(N.Y. App. Div. 2d Dep't 2002). Thus, LIPA was established by the Long Island Power Authority Act (the "LIPA Act") as a publicly owned power authority. N.Y. PUB. AUTH. LAW § 1020-a, *et seq.* In sum, Quogue and Westhampton Beach contend that, as a creature of statute, LIPA lacks powers that are not granted to it by express or necessarily implicated legislative delegation. Quogue Mem. at 3; Westhampton Beach Mem. at 15. However, LIPA notes that Section 1020-ii of the Act expressly requires that the Act's provisions be "liberally construed" because the Act is "necessary for the prosperity of the state and its inhabitants . . . ." LIPA Mem. at 1 (citing N.Y. PUB. AUTH. § 1020-ii). The Court now examines each relevant section of the LIPA Act to determine whether the Act provides a basis for LIPA to attach lechis to its utility poles.

### 1. Section 1020 of the LIPA Act

Section 1020-f of the LIPA Act grants LIPA "all the powers necessary or convenient to carry out the purposes and provisions of the Long Island Power Authority Act." N.Y. PUB. AUTH. § 1020-f. Those powers include the following:

> (d) To . . . own, hold, improve, employ, use and otherwise deal in and with, real or personal property whether tangible or intangible, or any interest therein, within the state;
>
> . . . .
>
> (f) To sell, convey, lease, exchange, transfer, abandon or otherwise dispose of, or mortgage, pledged or create a security interest in, all or any of its assets, properties or any interest therein, wherever situated;
>
> . . . .
>
> (h) To make and execute agreements, contracts and other instruments necessary or convenient in the exercise of the powers and functions of the authority under this title, including contracts with any person, firm, corporation, municipality, state agency or

other entity in accordance with the provisions of section three of the general municipal law . . .

N.Y. PUB. AUTH. § 1020-f(d), (f), (h).[12]

### a. The Parties' Arguments

LIPA maintains that the utility poles are its "property" and the license agreements regarding the attachment of lechis "deal in" such poles as outlined in Section 1020-f(d) of the LIPA Act. LIPA Mem. at 2. Moreover, the license agreements at issue here "convey" and "dispose of" an interest in LIPA's assets and properties as permitted by Section 1020-f(f) of the LIPA Act. *Id.* at 3. Further, LIPA argues, the license agreements are "contracts [or] other instruments necessary or convenient in the exercise of [LIPA's] powers and functions [under the LIPA Act]." LIPA argues that under Section 120-f, LIPA has the power to "own . . . use *and otherwise deal in* and with, real or personal property . . . or *any interest therein*." LIPA Mem. at 4. LIPA further has the power to "dispose of" and "convey" interests in property and assets, as well as the power to "make and execute agreements, contracts, and other instruments." *Id.* These powers, according to LIPA, also provide it with the authority to enter into license agreements regarding the lechis.

In contrast, Quogue contends that, as a public authority created by statute, LIPA solely has the powers necessary to provide safe, adequate and economical electric services within its service area. Quogue Mem. at 4. Quogue maintains that LIPA lacks the authority to enter into contracts to attach lechis to its utility poles since such contracts are not granted by express statutory provisions nor are they implicated by the enabling statute since the contracts are not

---

[12] Section 3 of the General Municipal Law relates to compensation for property of a municipal corporation, school district or district corporation taken by eminent domain. N.Y. GEN. MUN. LAW § 3 (McKinney's 2014).

related to LIPA's purpose to provide efficient, reliable and economical electricity.  *Id.*  Further, Quogue asserts it is undisputed that "the lechis proposed to be attached to Verizon's and LIPA's poles do not contribute to the generation or physical distribution of electricity, cable, telephone, internet, or other utility or communications service."  *Id.* (citing Joint Stip. ¶ 17).

### b.  Analysis

The Court finds that, even under a broad interpretation of the statute, Section 120 of the LIPA Act does not provide adequate authority for LIPA's contention that it may contract with private parties to attach items to their utility poles.  Although, as noted, LIPA argues that the language of the statute — for example, LIPA's ability to "deal in" its "property" — provides LIPA the authority to enter into contracts with private parties for the use of its utility poles, pursuant to the statute, any such power must be "necessary or convenient to carry out the purposes and provisions of the Long Island Power Authority Act."  N.Y. PUB. AUTH. LAW § 1020-f.  Similarly, any "agreements, contracts, and other instruments" LIPA may enter into, under this section of the LIPA Act, must be "necessary or convenient in the exercise of the powers and functions of [LIPA] under this title."  *Id.* § 1020-f(h).

While the purposes of the LIPA Act are not specifically enumerated, they are outlined in Section 120-a of the Act, which states that LIPA was created for the purpose of lowering rates and creating a more efficient, reliable, and economic supply of electricity.  N.Y. PUB. AUTH. LAW § 1020-a; *see Suffolk County v. Long Island Power Auth.*, 177 Misc. 2d 208, 213, 673 N.Y.S.2d 545, 549 (N.Y. Sup. Ct. 1998) (noting that the legislature created LIPA, "anticipating lower rates and a more efficient, reliable and economic supply of electricity"); *Citizens for an Orderly Energy Policy, Inc. v. Cuomo*, 78 N.Y.2d 398, 414, 576 N.Y.S.2d 185, 582 N.E.2d 568 (1991) ("[T]he recurring and unavoidable theme reflected in the legislative history [of the LIPA

Act] is that the intended *sine qua non* objective of the Act was to give LIPA the authority to save ratepayers money by controlling and reducing utility costs . . . ."); *accord Town of Islip v. Long Island Power Auth.*, 301 A.D.2d 1, 4, 752 N.Y.S.2d 320, 322 (N.Y. App. Div. 2d Dep't 2002) (stating purposes of LIPA were primarily to close the Shoreham nuclear power plant, to replace LILCO as the provider of electric power on Long Island, and to reduce electric power costs for Long Island ratepayers). The Court finds that LIPA's agreement with EEEA to attach lechis to its utility poles is not in furtherance of the purposes of this section of the LIPA Act. The agreement does not aid LIPA's purpose to create a more efficient, reliable, and economic supply of electricity — or any of the other purposes set forth in the case law. Nor is the agreement with EEEA to attach lechis to the utility poles "necessary or convenient in the exercise of the powers and functions" of LIPA.

### 2. Section 1020-g(c) of the LIPA Act

Notwithstanding the Court's finding that LIPA's agreement with EEEA does not further the purposes enumerated in Section 120-a of the LIPA Act, the discussion does not end there. Section 1020-g(c) of the LIPA Act permits LIPA to "determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility." N.Y. PUB. AUTH. LAW § 1020-g(c).

### a. The Parties' arguments

This provision of the Act, LIPA points out, contains no language that its power be limited to the LIPA Act's "purposes and provisions." LIPA Mem. at 3 (citing N.Y. PUB. AUTH. LAW § 120-g(c)). Further, LIPA contends, a pole is a "transmission or other related facility" as it contributes to supporting wires that transmit electricity to LIPA customers. *Id.* Thus, LIPA maintains that the statute's plain terms state, without limitation, that LIPA has the power to

"determine the . . . use  . . . of any . . . transmission or other related facility."  LIPA Mem. at 3 (citing Pub. Auth. § 120-g(c)).  Therefore, LIPA argues, its decision to permit the EEEA to attach lechis to utility poles — as well as its decision to allow other entities to hang signs and banners — "falls squarely within the legislature's unqualified grant of power to LIPA."  LIPA Mem. at 3.  In other words, the plain language indicates that these are powers which the legislature granted to LIPA to exercise in its discretion.  *Id.*  Neither Quogue nor Westhampton Beach specifically addresses this section of the statute in their papers.

### b.    Analysis

The plain meaning of the words of a statute has great weight in statutory interpretation.  *See Sandifer v. U.S. Steel Corp.*, 134 S. Ct.. 870, 876, 187 L. Ed. 2d 729 (2014) ("It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") (internal quotations omitted) (citing *Perrin v. United States*, 444 U.S. 37, 42, 100 S. Ct.. 311, 62 (1979)); *Bilski v. Kappos*, 130 S. Ct.. 3218, 3226 (2010) (same) (citing *Diamond v. Diehr,* 450 U.S. 175, 182, 101 S. Ct.. 1048 (1981)); *Browder v. United States*, 312 U.S. 335, 338, 61 S. Ct.. 599, 601 (1941) ("The plain meaning of the words of the act covers this use. No single argument has more weight in statutory interpretation than this); *see Nwozuzu v. Holder*, 726 F.3d 323, 326 (2d Cir. 2013) ("When interpreting a statutory provision, we begin with the language of the statute.  If the statutory terms are unambiguous, we construe the statute according to the plain meaning of its words.") (citations omitted); *Saks v. Franklin Covey Co.,* 316 F.3d 337, 345 (2d Cir. 2003) ("Every exercise in statutory construction must begin with the words of the text."); *Kilduff v. Rochester City School Dist.*, 107 A.D.3d 1536, 966 N.Y.S.2d 708 (N.Y. App. Div. 4th Dep't 2013) ("When presented with a question of statutory interpretation, 'courts should construe

unambiguous language [in a statute] to give effect to its plain meaning'") (alteration in original) (citing *DaimlerChrysler Corp. v. Spitzer,* 7 N.Y.3d 653, 660, 827 N.Y.S.2d 88 (N.Y. 2006)). The plain meaning is best discerned by "looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Nwozuzu*, 726 F.3d at 326; *Saks*, 316 F.3d at 345.

Here, the statute permits LIPA to determine the "lease" and "use" of any "transmission or other related facility." N.Y. PUB. AUTH. LAW § 1020-g(c). The statute does not include language limiting LIPA's use of its transmission or other related facilities to be in furtherance of the Act's "purposes and provisions." A "facility" is defined by the Oxford Dictionary as "[s]pace or equipment necessary for doing something." *See Definition of Facility*, OXFORD DICTIONARIES, http://www.oxforddictionaries.com/us/definition/american_english/facility?q=facility (last visited Apr. 14, 2014). Merriam-Webster defines facility as "something (such as a building or large piece of equipment) that is built for a specific purpose. *Definition of Facility*, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/facility (last visited Apr. 14, 2014). The Court agrees that LIPA's utility poles are "other related facilities" since they are large pieces of equipment which contribute to supporting wires that transmit electricity to LIPA customers. As a piece of equipment necessary for doing something, the utility poles fit the common understanding of a "facility." Thus, given the statutory terms their plain meaning, LIPA has the discretion to "use" or "lease" its poles as it sees fit.

Indeed, LIPA has entered into numerous agreements with private entities related to the lease of its poles, including one example of Westhampton Beach advertising the St. Patrick's Day Parade. Moreover, in light of the directive that the statute should be "liberally construed"

according to its terms, N.Y. PUB. AUTH. LAW. § 120-ii, the Court does not find this plain reading

of the statute to be at odds with the intention of its drafters. *See United States v. Livecchi*, 711

F.3d 345, 351 (2d Cir. 2013) ("Although the general rule of statutory interpretation is that a

statute should be enforced according to its plain and unambiguous meaning . . . the plain

meaning will not control where 'literal application of a statute will produce a result demonstrably

at odds with the intentions of its drafters.'") (quotation marks omitted) (citing *Tomka v. Seiler

Corp.,* 66 F.3d 1295, 1313 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc.

v. Ellerth*, 524 U.S. 742, 118 S. Ct.. 2257, 141 L. Ed. 2d 633 (1998)). Nor does this

interpretation "frustrate[ ] the statute's goals." *Livecchi*, 711 F.3d at 351; *New York v. Shore

Realty Corp*., 759 F.2d 1032, 1045 (2d Cir. 1985). As such, interpreting the statute according to

its plain meaning and looking to the statutory scheme as a whole, the Court finds that Section

1020-g(c) of the LIPA Act confers upon LIPA the discretion to lease or use its poles as it sees fit.

Again, this finding does not imply that a municipality may not impose some regulations upon

LIPA pursuant to its reasonable police powers, as outlined in Section III(d), *infra*.[13]

---

[13] LIPA argues that the creation of the eruv also supports the legislature's purpose in creating LIPA in that it improves the "health, welfare, and prosperity" of the citizens of the municipality. LIPA Mem. at 4 (citing N.Y. PUB. AUTH. LAW § 1020-p(1), 1020-a). Specifically, LIPA maintains that the creation of an eruv will contribute to this purpose because it will make certain areas more attractive as places for EEEA members to live and allow them to engage in various activities on the Sabbath that would otherwise be limited. LIPA Mem. at 4 (citing *ACLU v. City of Long Branch*, 670 F. Supp. 1293, 1296 (D. N.J. 1987) (holding that an eruv served the secular purpose of permitting "a large group of citizens to access public properties")). Further, LIPA contends that the legislature's purpose in creating LIPA was also to "realiz[e] savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area." LIPA Mem. at 4 (citing N.Y. PUB. AUTH. LAW § 1020-a). The lechis are subject to a small per pole license fee of five dollars per attachment per pole per year, which LIPA asserts will contribute to the cost-effective use of its resources and ultimately benefit ratepayers and taxpayers. LIPA Mem. at 5.

The Court does not find these arguments persuasive. The LIPA Act and the movement to replace LILCO with a public power authority arose out of increasing concern for the reliability

and affordability of electric power on Long Island. *See Citizens for an Orderly Energy Policy*, 582 N.E.2d 568, 579, 78 N.Y.2d 398, 421-2 (N.Y. 1991). "Rapidly escalating rates, excessive costs, insufficient power supply, and the economic ruin of LILCO were serious threats to the Long Island economy." *Id.* (citing N.Y. PUB. AUTH. LAW § 1020–a; Assembly Mem. Bill Jacket, L. 1986, ch. 517, at 13)). The focus of that concern was on LILCO's mismanagement and unresponsiveness to the public which caused many to "view LILCO as having breached its public trust and no longer deserving of exercising its monopoly electrical and gas franchise." *Citizens for an Orderly Energy Policy,* 78 N.Y.2d at 421, 582 N.E.2d at 579 (internal citations and quotations omitted). The "well-being, health and safety" of residents were threatened in the context of escalating and excessive costs of electricity under LILCO:

> Constantly escalating and excessive costs of electricity . . . . served by [LILCO] . . . pose a serious threat to the economic well-being, health and safety of residents of and the commerce and industry in the service area.
>
> There is a lack of confidence that the needs of the residents and of commerce and industry in the service area for electricity can be supplied in a reliable, efficient and economic manner by [LILCO].
>
> . . . .
>
> Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority . . . . In such circumstances, such an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area. Moreover, in such circumstances the replacement of such investor owned utilities by such an authority will result in an improved system and reduction of future costs and a safer, more efficient, reliable and economical supply of electric energy.

N.Y. PUB. AUTH. LAW § 1020–a. Based on the foregoing information, the Court finds that the establishment of an eruv does not necessarily relate to the "well-being, health and safety" concerns that the LIPA Act was designed to address. Nor is the Court convinced that the five dollar attachment fee has an impact on the cost-effective use of LIPA's resources in the context of the legislative findings and declarations set forth in the statute. However, the Court still finds that the LIPA Act provides LIPA with the discretion to use or lease its poles under Section 1020-g(c), which does not require that LIPA's use of its transmission or other related facilities be in furtherance of the Act's "purposes and provisions." Nor does that finding frustrate the purpose of the statute. *See Livecchi*, 711 F.3d at 351; *Shore Realty*, 759 F.2d at 1045.

Finally, although not discussed by the parties, the Pole Attachments Act, 47 U.S.C.

§ 224, provides additional support for the Court's finding that Verizon and LIPA are authorized

to enter into private agreements to attach items to their utility poles.  As discussed by the

Supreme Court in *F.C.C. v. Florida Power Corp.*, 480 U.S. 245, 247, 107 S. Ct.. 1107, 1109

(1987),

> [t]he Pole Attachments Act, 92 Stat. 35, as amended, 47 U.S.C.
> § 224, was enacted by Congress as a solution to a perceived danger
> of anticompetitive practices by utilities in connection with cable
> television service. Cable television operators, in order to deliver
> television signals to their subscribers, must have a physical carrier
> for the cable; in most instances underground installation of the
> necessary cables is impossible or impracticable. Utility company
> poles provide, under such circumstances, virtually the only
> practical physical medium for the installation of television cables.
> ***Over the past 30 years, utility companies throughout the country
> have entered into arrangements for the leasing of space on poles
> to operators of cable television systems. These contracts have
> generally provided for the payment by the cable companies of a
> yearly rent for space on each pole to which cables were attached,
> the fixed costs of making modifications to the poles and of
> physical installation of cables being borne by the cable operators.***

*Florida Power Corp.*, 480 U.S. at 247 (emphasis added).  The Pole Attachments Act was passed

in response to arguments by cable operators that utility companies were exploiting their

"monopoly position."  *Id.*   The Act provides that any cable company operating in a state which

does not regulate the rates, terms, and conditions of attachments by a cable television system or

provider of telecommunication services onto a pole owned or controlled by a utility may seek

relief from alleged overcharging before the Federal Communications Commission, which is

empowered to "regulate the rates, terms, and conditions for pole attachments to provide that such

rates, terms, and conditions are just and reasonable . . . ."  *Id.* at 248 (citing 47 U.S.C.

§ 224(b)(1)).  The Court in *Florida Power Corp.* does not discuss the basis — statutory or otherwise — for the utilities' ability to enter into private contracts with the cable companies for use of the poles.  In any event, the Pole Attachments Act and Supreme Court cases discussing the Act contemplate that utility companies around the country own their utility poles and may enter into private licensing agreements for the attachment of objects to those poles which are not related to the provision of telephone or electric services.  *See Florida Power Corp.*, 480 U.S. at 247; *National Cable & Telecommunications Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 330, 122 S. Ct. 782, 784 (2001) ("Since the inception of cable television, cable companies have sought the means to run a wire into the home of each subscriber.  They have found it convenient, and often essential, to **lease space for their cables on telephone and electric utility poles**.  Utilities, in turn, have found it convenient to charge monopoly rents.") (emphasis added).  However, this is not to say that the utilities may enter into agreements for the private use of their utility poles absent any regulation whatsoever from the municipalities.[14]

### D.     Local Ordinances, Village Laws and Police Powers

#### 1.     Background

Under Village Law § 6-602, the streets and public grounds of Quogue and Westhampton Beach are under the control and supervision of the Boards of Trustees of those villages.  N.Y. VILLAGE LAW § 6-602 ("The Streets and public grounds of the village constitute a separate highway district and are under exclusive control and supervision of the board of trustees . . . .").  N.Y. VILLAGE LAW § 4-412(3)(6) gives the Board of Trustees the power to "grant rights and

---

[14]  Indeed, the Pole Attachments Act was passed to provide some remedy for cable companies in states which *do not* regulate the rates, terms, and conditions of the cable company attachments – with the understanding that some states already have appropriate regulations in place.  *Florida Power Corp.*, 480 U.S. at 247; 47 U.S.C. § 224.  In fact, the Act specifically states that the FCC will not have jurisdiction over disputes where states already have a regulatory system which specifically addresses cable television pole attachments.  *See* 47 U.S.C. § 224(f).

franchises or permission to use the streets . . . [and] public places or any part thereof or the space above or under them . . . for any specific purpose upon such terms and conditions as it may deem proper and as may be permitted by law."  N.Y. VILLAGE LAW § 4-412(3)(6).

Section 158-1 of the Quogue Village Code prohibits encroachments or projections "upon, into or over any public road or street in the Village of Quogue . . . ."  QUOGUE, N.Y., VILLAGE CODE § 158-1.  The Quogue Village Code defines encroachment as:

> Any private use of any portion of a public right-of-way through any structure or device, whether upon, above or under said right of way; but nothing contained herein shall be construed to apply to any vehicle or any easement now legally owned by any public service corporation.  The term 'encroachment' also includes any private use of any portion of a public right of way for the display and sale of any products, goods, wares or merchandise.

*Id.* § 158-2.

Further, the Quogue Village Code defines "projection" as "any part of a building, structure or devise erected upon private property or attached to any structure or devise erected upon private property."  *Id.* § 158-2.  A public road or street is defined under the Quogue Village Code as "[t]he area between the extreme lines of any public right-of-way in [the Village of Quogue], including any state or country road or highways as well as a Village road or street."  *Id.*

### 2.    The Parties' Contentions

Essentially, Westhampton Beach and Quogue argue that local ordinances and village laws place the poles at issue under their control, and that local codes require town approval of the placement of any objects on utility poles.  Quogue Mem. at 10.  LIPA and Verizon, to the contrary, insist that none of the municipal regulations identified by the Defendants prohibits the attachment of lechis to utility poles, and, further, that the regulation of lechis is beyond the municipalities' police powers.  LIPA Mem. at 20; Verizon Mem. at 7.

Specifically, Westhampton Beach and Quogue state that since the poles are in the public streets and rights of way, as the term "streets" is defined under the Village Law, *see* Joint Stip. ¶ 16, the poles are subject to village control. Westhampton Beach Mem. at 3; Quogue Mem. at 8-9. Quogue argues that Verizon and LIPA currently possess a license or privilege to maintain their poles in Quogue for the public purpose of delivering telephone and electricity services to the residents of Quogue. Quogue Mem. at 8. When LIPA and Verizon choose to erect poles within the municipality, they can only do so with the consent of the municipal authorities. Quogue Mem. at 8-9 (citing N.Y. Transp. Corp. §§ 11, 25, 27). Westhampton Beach maintains that the municipalities' have "exclusive control and jurisdiction of the streets and public grounds located within a village." Westhampton Beach Mem. at 2 (citing N.Y. Const. art. XI, § 2(C)(6); N.Y. Mun. Home Rule Law § 10; N.Y. Village Law §6-602; *N.Y. State Pub. Employees Fed'n, A.F.L.-CIO by Condell v. City of Albany*, 527 N.E.2d 253, 254-5, 72 N.Y.2d 96, 100-101 (N.Y. 1988)). Therefore, Quogue and Westhampton Beach conclude, the municipalities retain authority over the utility poles. Further, Quogue asserts that the lechis qualify as "encroachments" or "projections" under the Quogue Village Code, and may therefore be regulated by the municipality. Quogue Mem. at 9-10. As such, Quogue points out that the Board of Trustees of the Village of Quogue denied the EEEA Action plaintiffs' application to allow the placement of lechis on utility poles. Quogue Mem. at 10 (citing Joint Stip., Ex. J).

LIPA and Verizon, however, claim that their rights and powers with respect to the utility poles derive from state law, not local law, and that state law expressly trumps any competing local law. LIPA Mem. at 20; Verizon Mem. at 8. Under the LIPA Act, LIPA has the "specific power" to "determine the location, type, size, construction, lease, purchase, ownership, acquisition, use and operation of any generating, transmission or other related facility." *Id.*

(citing Joint Stip., Ex. A; N.Y. PUB. AUTH. LAW § 1020-g(c)). Thus, according to LIPA, its authority to place and control its poles within the villages is superior to any authority the villages have to control the public streets or the area within the bounds of the public streets. LIPA Mem. at 20.

Significantly, Section 1020-jj of the LIPA Act provides that "insofar as the provisions of this title are inconsistent with the provisions of any other law or part thereof, the provisions of this title shall be controlling." N.Y. PUB. AUTH. LAW § 1020-jj. LIPA contends that the LIPA Act, and this language in particular, manifests the state legislature's restructuring the relative balance of powers between LIPA and the municipalities by assigning broad powers to LIPA. *Id.* at 13-14 (citing *Pawhuska v. Pawhuska Oil & Gas Co.*, 250 U.S. 394, 397 (1919) (stating a state may withdraw a legislative grant to a city of its power to regulate rates a gas company could charge and, instead, confer those regulatory powers upon a commission)). Accordingly, LIPA argues, any restrictions that the Court may find the franchises impose are no longer relevant due to the more recent language of the LIPA Act. LIPA Mem. at 14. Further, LIPA contends "even if municipal ordinances might apply to private entities and serve to limit their authority relating to their utility poles, LIPA enjoys absolute authority to locate and use its poles as it sees fit and, therefore, any franchise limits are inapplicable to LIPA." LIPA Mem. at 14. As such, LIPA maintains its broad authority relieves it of being subject to any sign ordinance. *Id.* However, LIPA notes that private parties which attach items to LIPA's poles do not enjoy the authority that LIPA has been given; therefore, LIPA leaves open the possibility that sign ordinances may remain effective against such parties if such attachments are, for example, impermissible "encroachments" as defined under the ordinances (assuming such restrictions are constitutionally permissible). *Id.* at 14 n.3.

By comparison, Verizon contends that the municipalities may generally impose reasonable limits on utility pole attachments pursuant to the municipalities' police powers. Verizon Mem. at 8. However, Verizon argues, the municipalities cannot ban *all* attachments to utility poles, because such a restraint would take away rights granted by state law. *Id.* Verizon and LIPA both maintain that their contracts with EEEA do not relate to the use of the street right-of-way, nor do they divert the highways from public to private use. Rather, the agreements relate to the use of Verizon and LIPA's own personal property. *Id.* at 9; LIPA Mem. at 19.

In any case, LIPA and Verizon assert, none of the municipal regulations cited by the Defendants prohibits the attachment of lechis to utility poles. LIPA Mem. at 18; Verizon Mem. at 7. Verizon and LIPA argue that Westhampton Beach has previously acknowledged that there is no such regulation. LIPA Mem. at 18-19; Verizon Mem. at 7. Since no applicable ordinance exists, LIPA and Verizon claim that any regulation related to the lechis must be based on Westhampton Beach's inherent police powers, which require Westhampton Beach to articulate a basis for concluding that the health, safety, morals, or general welfare of its residents warrant prohibiting the attachment of lechis to utility poles. Verizon Mem. at 10; LIPA Mem. at 19 (citing *Trs. of Union Coll. v. Members of the Schenectady City Council*, 690 N.E.2d 862, 864-5, 91 N.Y.2d 161, 165 (N.Y. 1997) ("With the police power as the predicate for the State's delegation of municipal zoning authority, a zoning ordinance will be struck down if it bears no substantial relation to the police power objective of promoting public health, safety, morals or general welfare.")). Verizon notes that the lechis are small and blend in aesthetically to the utility poles, and consequently will not affect the municipalities or the safety or quality of life of their residents. Verizon Mem. at 10.

With respect to Quogue, LIPA, Verizon, and the EEEA Action plaintiffs claim that the lechis do not qualify as "encroachments" or "projections" under the Quogue Village Code. Verizon Mem. at 9; LIPA Mem. at 18; EEEA Mem. at 11-12. Verizon and the EEEA Action plaintiffs note that the lechis are 5/8 inch half round strips of PVC that will be attached flush against the poles. Verizon Mem. at 9; EEEA Mem. at 13. LIPA, Verizon, and the EEEA Action plaintiffs argue that although "encroachment" encompasses the term "device," a lechi is not a "device" under the normal construction of the term, because a lechi is not a "contrivance" nor a "device" that performs a "mechanical" or "electrical" function. Verizon Mem. at 9; LIPA Mem. at 18; EEEA Mem. at 12. The EEEA Action plaintiffs also maintain that the Court should not determine whether the Quogue Village Code applies to the lechis at this juncture; instead, the issue to be decided is whether Verizon and LIPA have authority to attach the lechis, and the Code does not relate to or have any impact upon the determination of this specific question. EEEA Mem. at 10-11.

3. *Analysis*

a. **The LIPA Act and the Transportation Corporations Law do not "Trump" the Municipalities' Authority to Regulate Attachments to Utility Poles**

First, with respect to the municipalities' argument that the poles are in the public streets and rights of way and are therefore subject to village control, the parties have stipulated that Verizon and LIPA do not own the real property on which their utility poles stand, and that some or all of the utility poles stand within the bounds of the public streets of the municipalities, as the term "streets" is defined in New York Village Law § 6-600. Joint Stip. ¶ 16. However, the parties have also stipulated that the municipalities do not own the utility poles on which the lechis would be placed; rather, these poles belong to Verizon and LIPA. Joint Stip. ¶ 15. The

Court has already found that the franchise agreements do not limit LIPA or Verizon's ability to attach the lechis to the poles. The Court has also found that the Transportation Corporations Law and the LIPA Act provide a sufficient basis for Verizon and LIPA to enter into private contracts to attach items to their poles, unrelated to the provision of electrical or telephone services. *See* Sections III(A)-(C), *supra*.

Notwithstanding these findings, however, private property, such as the utility poles at issue here, may still be regulated by the municipalities. Verizon and LIPA state that their rights to the utility poles derive from state law, not local law, and that state law expressly trumps any competing local law. LIPA Mem. at 20; Verizon Mem. at 8. Indeed, the LIPA Act states that "[i]nsofar as the provisions of this title are inconsistent with the provisions of any other law or any part thereof, the provisions of this title shall be controlling." N.Y. PUB. AUTH. LAW § 120-jj. The Transportation Corporations Law does not appear to contain any similar provision. Courts have repeatedly addressed the issue of whether a municipal ordinance is invalid because the state legislature has preempted the area that the municipality had sought to enter. *See, e.g., Moore v. Cnty. of Suffolk*, 851 F. Supp. 2d 447, 457 (E.D.N.Y 2012); *Terrance v. City of Geneva*, 799 F. Supp. 2d 250, 254 (W.D.N.Y. 2011); *Vill. of Nyack v. Daytop Vil., Inc.*, 78 N.Y.2d 500, 505, 577 N.Y.S.2d 215, 217 583 N.E.2d 928, 929-30 (N.Y. 1991); *People v. Diack*, 974 N.Y.S.2d 235, 237 (N.Y. Sup. App. Term. 2013). The preemption doctrine represents a fundamental limitation on a municipality's "home rule" powers. *Terrance*, 799 F. Supp. 2d at 254; *see Sunrise Check Cashing & Payroll Servs., Inc. v. Town of Hempstead*, 91 A.D.3d 126, 133, 933 N.Y.S.2d 388 (N.Y. App. Div. 2d Dep't 2011) ("[T]he power of local governments to enact laws is subject to the fundamental limitation of the preemption doctrine."); *Woodbury Heights Estates Water Co., Inc. v. Vill. of Woodbury*, 37 Misc.3d 180,185, 943 N.Y.S.2d 385, 389 (N.Y. Sup. Ct. 2012)

("[L]ocal power is subject to a fundamental limitation by the preemption doctrine . . . ."). Local police power may not be exercised in an area in which it is preempted by state law. *Terrance*, 799 F. Supp. 2d at 254 (citing *Jancyn Mfg. Corp. v. Cnty. Of Suffolk*, 71 N.Y.2d 91, 96, 524 N.Y.S.2d 8, 518 N.E.2d 903 (N.Y. Sup. Ct. 1987)); *Sunrise Check Cashing*, 91 A.D.3d at 133, 933 N.Y.S.2d at 394; *Woodbury Heights*, 943 N.Y.S.2d at 389.

Preemption applies where there exists an express conflict between local and state law as well as in cases where the state has evidenced its intent to occupy the field. *Terrance*, 799 F. Supp. 2d at 254 (citing *Albany Area Bldrs. Ass'n v. Town of Guilderland*, 74 N.Y.2d 372, 377, 547 N.Y.S.2d 627, 546 N.E.2d 920 (N.Y. 1989); *Sunrise Check Cashing*, 933 N.Y.S.2d at 394; *Diack*, 974 N.Y.S.2d at 237; *Woodbury Heights*, 943 N.Y.S.2d at 389. Where a state statute expressly preempts local law, "analysis of the scope of the pre-emption statute must begin with its text." *See Ace Auto Body & Towing, Ltd. v. City of N.Y.*, 171 F.3d 765, 771 (2d Cir. 1999) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484, 116 S. Ct.. 2240, 135 L. Ed. 2d 700 (1996)). Implied preemption may be "inferred from a declaration of State policy by the Legislature or from the legislative enactment of a comprehensive and detailed regulatory scheme in a particular area . . . ." *Terrance*, 799 F. Supp. 2d at 254 (citing *N.Y. State Club Assn. v. City of N.Y.*, 69 N.Y.2d 211, 217, 513 N.Y.S.2d 349, 505 N.E.2d 915, 917 (N.Y. 1987)); *Sunrise Check Cashing*, 933 N.Y.S.2d at 394; *Diack*, 974 N.Y.S.2d at 237; *Woodbury Heights*, 943 N.Y.S.2d at 389. In general, police powers are not to be superseded unless the legislature has demonstrated a clear and manifest purpose to do so. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct.. 2247, 2256 (2013); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 408 (2d Cir. 2013); *Ace Auto Body*, 171 F.3d at 771; *Jovel v. i-Health, Inc.*, No. 12-CV-5614, 2013 WL 5437065, at *5 (E.D.N.Y. Sept. 27, 2013). Further, the New York Court of Appeals has

exhibited a reluctance to overturn local laws, finding that the laws enacted by local legislatures have an "exceedingly strong presumption of constitutionality." *Lighthouse Shores v. Town of Islip*, 359 N.E.2d 337, 340-2, 41 N.Y.2d 7, 11, 390 N.Y.S.2d 827 (N.Y. 1976); *McDonald v. N.Y. City Campaign Finance Bd.*, 965 N.Y.S.2d 811, 823 (N.Y. Sup. Ct. 2013); *accord Nicholson v. Inc. Vill. of Garden City*, 112 A.D.3d 893, 978, 978 N.Y.S.2d 288, 289 (N.Y. App. Div. 2d Dep't 2013).

The Court finds here that there is no language in the either the LIPA Act or the Transportation Corporations Law specifically pre-empting a village's authority to regulate attachments to utility poles. Nor is there any evidence from the legislative history of a "declaration of state policy" that would supersede the municipalities' police powers to regulate this area. As a result, the Court finds that the municipalities' ability to regulate attachments to utility poles as a function of their police powers is not preempted by the LIPA Act or the Transportation Corporations Law.[15] *See, e.g., Norse Energy Corp. U.S.A. v. Town of Dryden*, 108 A.D.3d 25, 964 N.Y.S.2d 714 (N.Y. App. Div. 3rd Dep't 2013) (finding local zoning ordinance was not preempted by state law where ordinance did not conflict with state law language or policy); *McDonald*, 965 N.Y.S.2d at 828 (finding local law did not conflict with

---

[15] The Court notes that, even in cases where preemption is found, courts may still allow a municipality to continue to exercise its local police powers. *See Green Mountain R.R. Corp. v. Vermont,* 404 F.3d 638, 645 (2d Cir. 2005). For example, in *Green Mountain R.R. Corp.*, the Second Circuit held that the Interstate Commerce Commission Termination Act (the "ICCTA"), a federal statute, preempted the enforcement of local zoning ordinances against a rail carrier seeking to construct a rail yard on land abutting a line of track. *Id.* The court held that "[t]he plain language of section 10501 [of the ICCTA] reflects clear congressional intent to preempt state and local regulation of integral rail facilities." *Id.* However, the court also held that local authorities may continue to exercise "traditional police powers," under certain conditions, including where the "regulations protect public health and safety, are settled and defined" and "can be obeyed with reasonable certainty." *Id.* at 643. Thus, even in cases where a local regulation may be preempted, a locality may still exercise its police powers to protect public health and safety under certain circumstances. *Id.*

state's election law, noting that localities are accorded a great amount of latitude in passing local legislation to address local issues, even when a state has already legislated in those areas); *In re City of Rochester*, 90 A.D.3d 1480, 1482, 935 N.Y.S.2d 748, 751 (N.Y. App. Div. 4th Dep't 2011) (finding local law authorizing inspection warrants was not preempted because nothing in state law governed administrative search warrants nor was there any indication that state law intended to preempt local governments from enacting laws governing such warrants).

Moreover, numerous courts have recognized a municipality's right to regulate private property based on a valid exercise of its police powers. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 362, 122 S. Ct.. 1465, 1481 (2002) (noting some regulation of private property permitted under the police power, so long as restrictions do not amount to a taking); *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 100 S. Ct.. 2035, 2041 (1980) (same); *Casciani v. Nesbitt*, 659 F. Supp. 2d 427, 436-40 (W.D.N.Y. 2009) (upholding town ordinance prohibiting operation of private aircraft and airports within town as valid exercise of police powers, even where plaintiff was no longer able to fly his helicopter to and from his private property); *N.Y. City Friends of Ferrets v. City of N.Y.*, 876 F. Supp. 529, 534 (S.D.N.Y. 1995) (upholding city regulation prohibiting the keeping of ferrets within city limits and requiring destruction of ferrets which had attacked human beings, finding regulation a valid exercise of police power to protect health and safety notwithstanding any deprivation of private property); *Dovman v. Yahashi*, 442 N.Y.S.2d 349, 350, 109 Misc.2d 484, 485 (N.Y. App. Term 1981) ("In exercising the police power to provide for the general welfare, the State may reasonably regulate the use of private property, notwithstanding the curtailment of private property rights.") (citing *Modjeska Sign Studios, Inc. v. Berle*, 43 N.Y.2d 468, 474–475, 402 N.Y.S.2d 359, 363-5, 373 N.E.2d 255, 258-60 (N.Y. 1977)); *Taksen Liquor Store, Inc. v.*

*Bonisteel*, 425 N.Y.S.2d 252, 254, 103 Misc.2d 34, 35 (N.Y. Sup. Ct. 1980) (finding that municipality could regulate signs on private property and remove signs that did not comply with local ordinance, noting that regulation was valid whether deemed a zoning ordinance, a landmark regulation, or an exercise of the police power; critical test of constitutionality was whether the challenged legislation deprives a property owner of *all* reasonable use of his property); *accord N.Y. Tel. Co. v. Comm'r of N.Y. State Dep't of Transp.*, 307 N.Y.S.2d 945, 949 (N.Y. Sup. Ct. 1970) (finding franchise granted to plaintiff by Section 27 of the Transportation Corporations law was subject to the limitations imposed by the police powers of the state).

Based on the foregoing analysis, the Court finds that the LIPA Act and the Transportation Corporations Act do not "trump" the municipalities' ability to effect regulations within the valid exercise of their police powers with respect to the utility poles, notwithstanding the fact that those poles constitute the private property of Verizon and LIPA.

> **b. Westhampton Beach and Quogue's Police Powers Permit The Municipalities to Regulate Attachments to Utility Poles Under Certain Circumstances**

States have the authority under their police powers to enact laws protecting the health, safety, and welfare of their citizens. *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 292 (E.D.N.Y. 2010) (citing *United Haulers Ass'n Inc. v. Oneida–Herkimer Solid Waste Mgmt.,* 550 U.S. 330, 342, 127 S. Ct.. 1786, 167 L. Ed. 2d 655 (2007)). In New York, Section 10 of the Municipal Home Rule extends this police power to counties, cities, towns, and villages. *Castanza*, 700 F. Supp. 2d at 292 (citing N.Y. MUN. HOME. RULE LAW § 10)). Thus, as a general rule, efforts to protect public health, safety, and welfare are within the province of Westhampton Beach and Quogue. *See Lyn v. Inc. Vill. of Hempstead*, 308 Fed. App'x 461, 464 (2d Cir. 2009) ("[E]fforts to protect public health and safety are clearly within [a] city's police powers.") (citing

*City of Erie v. Pap's A.M.,* 529 U.S. 277, 296, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000) (upholding city ban on nudity in public places since city's efforts to protect public health and safety were clearly within its police powers)).

Moreover, aesthetics constitute a valid basis for the exercise of the police power. *See Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 805, 104 S. Ct.. 2118 (1984) ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."); *Lusk v. Vill. of Cold Spring*, 475 F.3d 480, 491 (2d Cir. 2007) (preservation of aesthetic values is a legitimate government interest); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (same) (citing *Suffolk Outdoor Advertising Co. v. Hulse*, 43 N.Y.2d 483, 490, 402 N.Y.S.2d 368, 373 N.E.2d 263 (1977) (holding that ordinances banning billboards were constitutional, as "aesthetics constitutes a valid basis for the exercise of the police power")).

Courts have also recognized that the regulation of signs for aesthetic (among other) concerns is a valid exercise of police power. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48, 114 S. Ct.. 2038, 2042 (1994) ("While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs."); *Payless ShoeSource, Inc. v. Town of Penfield*, 934 F. Supp. 540, 543 (W.D.N.Y. 1996) ("The law in New York is well settled that a town, pursuant to its police power, may impose sign restrictions in order to regulate aesthetics."); *Hulse*, 43 N.Y.2d at 489 (finding town sign ordinance reasonable exercise of police power since it was reasonably related to public safety and welfare); *People v. Goodman*, 31

N.Y.2d 262, 338 N.Y.S.2d 97, 290 N.E.2d 139 (N.Y. 1972) ("State and its political subdivisions

may regulate the erection and maintenance of outdoor advertising under the police power . . .

villages are empowered by statute to regulate the maintenance of advertising media near streets

and in public places . . . and to adopt ordinances for general purposes consistent with the exercise

of the police power . . . .").[16]

Indeed, while the Court has found numerous examples of cases discussing the validity of

municipal sign ordinances and the regulation of pole attachments for aesthetic purposes, it has

found no cases discussing whether ordinances regulating lechis are a valid exercise of police

power. The closest case involves an eruv which was established in the Borough of Tenafly, New

Jersey. *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 152 (3rd Cir. 2002). There, an

ordinance provided that "[n]o person shall place any sign or advertisement, *or other matter* upon

any pole, tree, curbstone, sidewalk or elsewhere, in any public street or public place, excepting

such as may be authorized by this or any other ordinance of the Borough." *Borough of Tenafly*,

309 F.3d at 151 (emphasis added). The Borough sought to restrict the establishment of the eruv,

including the attachment of lechis to utility poles, pursuant to the terms of the ordinance. *Id.*

The court in *Tenafly* found that the ordinance was selectively enforced against the plaintiffs, and

that, as such, the ordinance as applied likely violated the Free Exercise Clause. *Id.* at 168. The

---

[16]  The Court points out, however, that just as municipal restrictions on private property may not be so broad as to constitute a taking under the Fifth Amendment, sign ordinances may not run afoul of the First Amendment. *See, e.g., Liquormart, Inc. v. Rhode Island*, 517 U.S. 848, 501-02, 116 S. Ct.. 1495, 1507 (1996) (complete speech bans, unlike content-neutral restrictions on time, place, or manner of expression, foreclose alternative means of disseminating certain information and, thus, are particularly dangerous and warrant more careful constitutional review); *Lusk*, 475 F.3d at 489 (erection of signs on residential property, a "unique and important medium of expression," may not be broadly burdened); *Sugarman v. Village of Chester*, 192 F.Supp.2d 282, 293 (S.D.N.Y. 2002) (upholding village ordinance requiring permit to post temporary signs because it was reasonable time, manner, and place restriction on speech, narrowly tailored to support village's significant government interests in aesthetics and public safety).

court did not address whether or not the ordinance on its face was a valid exercise of the borough's police power, nor did the ordinance at issue specifically mention the attachment of lechis. In any case, neither Westhampton Beach nor the Village of Quogue have pointed to any ordinance specifically regulating lechis. Therefore, the Court will examine whether the municipalities have enacted ordinances or regulations which may apply to the attachment of lechis.

### c. Westhampton Beach Has Not Passed Any Ordinance Prohibiting the Attachment of Lechis to Utility Poles

Westhampton Beach has previously acknowledged during a preliminary injunction hearing in the EEEA Action that it has no regulation regarding the establishment of an eruv:

> MR TELLER: I don't know of any of our code or laws that affect the eruv application to us . . . I don't know of any laws, codes, in our village compiled that affect the eruv, nonapplication or an application.

*East End Eruv Assoc. v. Vill. of Westhampton Beach*, 11-cv-213, Tr. of June 27, 2011 Preliminary Injunction Hearing, 279:17-23. Westhampton Beach has also previously conceded that a lechi is not a "sign" under the municipality's sign ordinance. *East End Eruv Assoc. v. Vill. of Westhampton Beach*, 828 F. Supp. 2d 526, 535 (E.D.N.Y. 2011) ("The Westhampton Beach Defendants concede that a lechi is not a 'sign' under Westhampton Beach's sign ordinance . . . ."). Westhampton Beach has not pointed to any other existing ordinance or regulation prohibiting the attachment of lechis to utility poles. Thus, the Court finds that there is no regulation in the Town of Westhampton Beach prohibiting the establishment of the eruv or the attachment of lechis to utility poles.

Westhampton Beach argues that under its police power over the streets, it may restrict the use of the utility poles. Westhampton Beach Mem. at 14, 19. The Court agrees, so long as those restrictions are imposed for the health, safety, and welfare of the community. However, in this instance, Westhampton Beach has not pointed to any ordinance that prohibits the attachment of lechis. Nor has Westhampton Beach argued that its sign ordinance applies to lechis. Consequently, the Court will not undertake an analysis of whether an ordinance regulating the attachment of lechis would be a valid exercise of Westhampton Beach's police power where no such ordinance exists. In the case of Westhampton Beach, then, the Court finds that there is no regulation prohibiting the establishment of the eruv or the attachment of lechis to utility poles.

### d. The Parties Have not Adequately Addressed Whether This Court has Authority to Evaluate Whether the Quogue Village Code Applies to the Lechis

As noted, Quogue argues that Section 158-1 of the Quogue Village Code applies to lechis. Quogue Mem. at 9-10. The Quogue Village Code prohibits encroachments or projections "upon, into or over any public road or street in the Village of Quogue . . . ." Quogue, N.Y., Village Code § 158-1. The Quogue Village Code defines encroachment, in part as "[a]ny private use of any portion of a public right-of-way through any structure or device, whether upon, above or under said right of way . . . ." *Id.* § 158-2.[17] Further, the Quogue Village Code defines "projection" as "any part of a building, structure or devise erected upon private property or attached to any structure or devise erected upon private property." *Id.* § 158-2.

---

[17] A public road or street is defined under the Quogue Village Code as "[t]he area between the extreme lines of any public right-of-way in [the Village of Quogue], including any state or county road or highways as well as a Village road or street." Quogue, N.Y., Village Code § 158-2. The parties have stipulated that some or all of the utility poles at issue stand within the bounds of the public streets of Westhampton Beach and Quogue. Joint Stip. ¶ 16

As an initial matter, the Court finds that the Code here appears to be a valid exercise of the municipalities' police powers. For example, the statute is reasonably related to the safety of the residents of Quogue and the aesthetics of the municipality. *See Taxpayers for Vincent,* 466 U.S. at 805; *Lusk*, 475 F.3d at 491; *Cellular Tel. Co.*, 166 F.3d at 494; *City of Ladue*, 512 U.S. at 48; *Payless ShoeSource*, 934 F. Supp. at 543; *Suffolk Outdoor Advertising Co.*, 373 N.E.2d at 265; *Goodman*, 290 N.E.2d at 139. Moreover, none of the parties appear to argue that the Quogue Village Code, on its face, is not a valid regulation.

However, the parties do dispute the applicability of the regulation to the lechis. Importantly, though, the parties have stipulated that the EEEA filed an application with the Quogue Village Board of Trustees dated January 16, 2012 to allow the placement of lechis on certain utility poles in Quogue. Joint Stip. ¶ 20 and Ex. J. By decision dated May 18, 2012, the Board of Trustees unanimously denied the EEEA's application to attach lechis to utility poles in Quogue. Joint Stip. ¶ 20 and Ex. J. Indeed, Quogue points out that the Board of Trustees denied the EEEA's application to allow the placement of lechis on utility poles. Quogue Mem. at 10 (citing Joint Stip., Ex. J). While the parties argue about whether a lechi is a "device" or "projection" under the Quogue Village Code, none of the parties appear to discuss that the Quogue Board of Trustees denied EEEA's application in part because the Board found that the lechi is a "device" within the meaning of the Quogue Village Code. *See* Joint Stip., Ex. J. Specifically, the Board of Trustees found that:

> The placement of lechis as requested in the application is undeniably a "private use;" a lechi is a "device within any normal construction of that term; and the lechis will be located "upon [or] above . . . the right-of-way." A lechi is therefore plainly an "encroachment" within the meaning of Section 158-2.

*Id.* at 3.  Quogue points out the Board of Trustee's decision and states that the EEEA has not appealed this finding.  Quogue Mem. at 9-10.  However, none of the parties address by what authority this Court may (or may not) interpret a municipal ordinance in light of the Board of Trustees' existing findings.  In light of the lack of briefing on this issue, the Court will not make a determination whether the Quogue Village Code regulates the attachment of lechis to utility poles.  The Court will, however, allow some limited further briefing on this issue upon the parties' request.[18]

## V.   CONCLUSION

Based on the foregoing considerations and analysis, the Court finds:

(1)    The franchise agreements at issue here do not limit Verizon or LIPA's authority to enter into contracts with EEEA for the attachment of lechis to the utility poles;

(2)    The Transportation Corporations Law and the LIPA Act provide sufficient authority for Verizon and LIPA to enter into private contracts for the use of their utility poles, unrelated to the provision of electric or telephone services;

(3)    Westhampton Beach and the Village of Quogue have the authority to regulate the utility poles owned by Verizon and LIPA and in the public streets and rights of way of the municipalities pursuant to their reasonable police powers;

(4)    Westhampton Beach has not passed any ordinance or regulation which prohibits the attachment of lechis to the utility poles at issue here; therefore, nothing prohibits LIPA or Verizon from entering into contracts to facilitate the attachment of lechis to their utility poles in Westhampton Beach;

---

[18]    As noted, the EEEA Action plaintiffs argue that the Court should not determine whether the Quogue Village Code applies to the lechis at this juncture because the issue to be decided is whether Verizon and LIPA have authority to attach the lechis, and the Code does not relate to or have any impact upon the determination of this specific question.  EEEA Mem. at 10-11.  The Court's finding that it does not have enough information to determine whether an analysis of the Quogue Village Code is appropriate at this juncture should not be construed as a finding that the Quogue Village Code impacts the determination of LIPA and Verizon's authority to attach lechis to their utility poles in Quogue.

(5)     The Court does not have enough information to determine if it may properly address whether the Quogue Village Code applies to the lechis in light of the decision of the Board of Trustees.  The parties may contact the Court if they wish to pursue this issue.

**SO ORDERED.**


Dated:  Central Islip, New York
        June 16, 2014


                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge